[Civil No. 3571.   Filed December 7, 1936.]

[62 Pac. (2d) 1144.]

# THE SOVEREIGN CAMP OF THE WOODMEN OF THE WORLD, a Corporation, Appellant, v. FRANCISCA MUNGIA DANIEL, Appellee.

480

Mr. Thomas W. Nealon, for Appellant.

Mr. Gayle H. Nichols, for Appellee.

LOCKWOOD, C. J.—Francisca Mungia Daniel, hereinafter called plaintiff, brought suit against the Sovereign Camp of the Woodmen of the World, a corporation, hereinafter called defendant, as beneficiary under a certain certificate of insurance issued by defendant to Manuel Daniel, the husband of plaintiff, hereinafter called deceased, who died on the 15th day of March, 1933. The case was tried to a jury which returned a verdict in favor of plaintiff, and after the usual motion for new trial was made and overruled, this appeal was taken.

The record shows the following situation. Deceased had previous to 1933 taken out insurance with the defendant at least twice, but had allowed his policies to lapse. On the 6th day of February of that year, feeling himself to be somewhat indisposed, he consulted Dr. Paul M. Rierson of Miami. He returned for treatment on the 8th, 10th and 12th of February. Dr. Rierson examined the urine of deceased, either on the 6th or 8th of February, and at that time discovered that he was suffering from chronic nephritis, and probably also had pernicious anemia. On the 15th of February, deceased made application for the insurance certificate which is the basis of this action.

The application contained, among other things, the following provisions:

"For the purpose of securing the beneficiary certificate herein applied for, I hereby warrant that I have not been sick, except as stated herein; that I am now in sound bodily health; that I have no injury or disease that will tend to shorten my life; . . . "

"I hereby consent and agree that this application, including the foregoing answers made by me under the headings 'Personal History' and 'Family History,' and all the provisions of the Constitution, Laws and By-Laws of the Association, now in force or that may hereafter be adopted, shall constitute the basis for and form a part of any beneficiary certificate that may be issued to me by the Sovereign Camp of the Woodmen of the World, whether printed or referred to therein or not."

"I hereby certify, agree and warrant that all the statements, representations and answers in this application are full, complete and true, whether written by my own hand or not, . . . "

" . . . I further agree that the liability of the Sovereign Camp for the payment of benefits shall not begin until after this application shall have been accepted by the Medical Director, a beneficiary certificate issued thereon and personally delivered to me, as provided in the Constitution, Laws and By-Laws of the Association, by an authorized person while I am in good health, nor until I shall have been obligated in due form and all the requirements of the Constitution, Laws and By-laws of said Association have been complied with."

In response to the questions:

"7. Have you within the past five years suffered any mental or bodily disease or infirmity?

"8. Have you within the past five years consulted or been attended by a physician for any disease or injury or undergone any surgical operation?"

he answered "No." He again consulted Dr. Rierson on the 20th and 24th of February and was treated

by him. On the 1st of March, a certificate was delivered to deceased, in accordance with the terms of his application. It contained the following clause, printed in both English and Spanish, which clauses were both signed by deceased when he accepted the certificate:

"I have read the above certificate and accept the same, and warrant that I am now in good health and have not been sick or injured since the date of my application."

On the 3d, 9th and 13th of March, he was again treated by Dr. Rierson, and his condition on the last date was so serious that he was ordered to go to the hospital, where he died on the 15th of March. The cause of his death, as certified by Dr. Rierson, was pernicious anemia and chronic nephritis. The doctor, on cross-examination, testified that while he could not state positively that the nephritis was chronic on the 15th of February and that at that time he had pernicious anemia, he could and did state positively that on the 1st day of March he was suffering from both diseases. The only other medical witness on the subject was Dr. J. H. Patterson, who did not testify from personal knowledge of the deceased, but in answer to hypothetical questions. In response to these questions he stated, in substance, that an acute nephritis could be produced by a party becoming chilled and wet and contracting a severe cold, and that a long-continued hemorrhage could cause pernicious anemia. He also stated, however, that a man might be suffering from chronic nephritis and pernicious anemia and up to at least a very few days of his death believe that he was in good health, although he was not.

The plaintiff testified that deceased had been exposed to a cold rain for several hours in the early

part of March. She also produced a couple of witnesses who said they had seen deceased repeatedly a month or two before his death and up to the last few days of his life he had no appearance of being ill. She testified as to the circumstances under which she claimed the application for insurance was made and the policy received, stating that her husband was unable to read or write either Spanish or English, except that he could sign his name, and that he signed the application in blank upon the assurance of a soliciting agent of defendant that it would be filled in properly, and that he signed the warranty on the policy itself without knowing what it contained. She admitted, however, that at the time the application was signed and the certificate received and signed by deceased, both she and her niece were present, and that she could both read and write Spanish, while her niece, a girl of 17, had been educated in the schools of the United States. The printed part of the application in regard to the warranty of good health was in English, while that in the certificate which was signed by deceased was in both languages. This states the admitted facts and the substance of the conflicting testimony sufficiently for a determination of this appeal.

There are a number of assignments of error, but these raise, in substance, but two questions. One is, Was the deceased in good health, within the meaning of the law and the contract of insurance, at the time he signed the application, and also at the time he received his policy? The second is whether the failure of deceased to read the warranties of good health which he signed, under the circumstances testified to by plaintiff, bars her from claiming he did not know the warranties were made by him, and that he was not bound thereby.

■ It will be seen from the foregoing statement of facts that the application, insurance certificate, and the constitution and by-laws of the defendant all required, as a condition precedent to the assumption of any liability on the insurance certificate issued to deceased, that he should be in good health at the time it was issued and delivered to him, and that he certified not only that he was in good health at the time of his application on February 15th, but at the time of the delivery of the certificate on March 1st. Since his warranty was a condition precedent to the taking effect of the policy, if, at the time of its delivery he were not in good health, the minds of the parties did not meet, the contract was never completed, and the policy was void *ab initio*. *Security Benefit Assn.* v. *Small*, 34 Ariz. 458, 272 Pac. 647, 649; *Supreme Lodge, etc.*, v. *Grijalva*, 28 Ariz. 77, 235 Pac. 397; *Sovereign Camp, etc.*, v. *De Ortega*, 37 Ariz. 185, 291 Pac. 996; *Logia Supreme, etc.*, v. *De Alonzo*, 28 Ariz. 230, 236 Pac. 708. Nor, indeed, is this general rule of law seriously disputed by plaintiff. It is her contention, however, that the evidence is not sufficient to establish, as a matter of law, that deceased was not in good health when the policy was delivered, and that he was deceived by defendant's agent in regard to the warranty being in the application and certificate. The term ''good health'' in an application for a life insurance policy, has been frequently defined. We think the following definition is as satisfactory as any:

''Slight troubles, temporary and light illness, infrequent and light attacks of illness, not of such a character as to produce bodily infirmity or serious impairment or derangement of vital organs, do not disprove the warranty of good health. In other words, the term 'good health,' when used in a policy of life insurance, means that the applicant has no grave,

important, or serious disease, and is free from any ailment that seriously affects the general soundness and healthfulness of the system. *Barnes* v. *Fidelity Mut. Life Assn.*, 191 Pa. 618, 43 Atl. 341, 342, 45 L. R. A. 264 (citing 3 Joyce, Ins., § 2004); *Goucher* v. *Northwestern Traveling Men's Assn.*, ([C. C.] U. S.) 20 Fed. 596, 598; *Provident Sav. Life Assur. Soc. of New York* v. *Beyer*, (Ky.) 67 S. W. 827, 828; *Hann* v. *National Union*, 97 Mich. 513, 56 N. W. 834, 836, 37 Am. St. Rep. 365; *McDermott* v. *Modern Woodmen of America*, 97 Mo. App. 636, 71 S. W. 833, 837.'' Words and Phrases, First Series, vol. 4, 3122.

The question then is, Does it appear conclusively that the deceased was not in good health at the time of the issuance of the policy? The burden of proof of bad health, of course, rests upon the defendant. The only direct evidence we have upon this point is the testimony of Dr. Rierson. He stated positively and categorically that from his own knowledge obtained by examination and treatment of the patient, from the 6th of February to the 1st of March, that on the last-named date deceased was suffering certainly from chronic nephritis and probably from pernicious anemia, and that his death on March 15th was due to these two causes. There is no evidence contradicting this testimony, nor was the witness impeached nor his testimony discredited by any other evidence in the case. The only other medical witness testified merely in response to hypothetical questions, that a man of 30 years of age who had become wet and contracted a severe cold and hemorrhaged for a period of 6 to 8 days might suffer an attack of pernicious anemia and acute nephritis as a result of such chilling. He also stated that a man might think he was in good health when, as a matter of fact, he was not. This testimony is in no way inconsistent with nor contradictory of the testimony of Dr. Rierson that on the 1st of March the deceased was certainly suffering

from chronic nephritis, and probably from pernicious anemia. We have held that, when a reputable and unimpeached witness testifies positively to a condition existing of his own knowledge, a jury may not disregard his testimony. *Otero* v. *Soto,* 34 Ariz. 87, 267 Pac. 947; *Equitable Life Assur. Soc.* v. *De Johnson,* 36 Ariz. 428, 286 Pac. 817. We think it appears from the uncontradicted and unimpeached evidence in the record that deceased died from chronic nephritis and pernicious anemia, and that on March 1st (the time at which his certificate was delivered to him) he was suffering at least from the first named of those diseases.

The question then is, Was he, within the meaning of the definition above set forth, in "good health" at the time the certificate was so accepted? It is argued strenuously that chronic nephritis is not necessarily a fatal disease, and that people may live for many years with it and die from some other cause, and that the testimony of Dr. Rierson in regard to pernicious anemia was not so positive that we must assume, as a matter of law, that deceased was suffering from the last-named ailment on March 1st. Assuming, for the sake of argument, the latter be true, we are of the opinion that the chronic nephritis testified positively to by the doctor fell within the meaning of the definition. In the case of *Security Benefit Assn.* v. *Small, supra,* we said: "It is a matter of common knowledge that tuberculosis is a lingering disease so insidious in character that it may and usually does creep upon its victim and secure a firm hold before he realizes it." We are also of the opinion that it is a matter of common knowledge that patients may have tuberculosis for many years, even in its active state, continue in their regular occupation, and die of some other disease. And yet no man would claim that a

person afflicted with an active case of tuberculosis was in "good health." In like manner, we think it is a matter of common knowledge that, while chronic nephritis is a disease which may exist for many years without incapacitating its victim from more or less active work, yet it may at any time and within a very short period develop so rapidly as to cause death. We think an applicant for insurance, who is afflicted with chronic nephritis, cannot be said to be in "good health."

■■ It is urged by plaintiff that, even admitting the deceased was not in good health at the time he made the warranties in question, he made these without his knowledge and through the fraudulent conduct of the agent of the defendant, and that therefore he is not bound thereby. The fraudulent conduct referred to is based on the testimony of plaintiff and her niece that the application was signed by deceased in blank, on the representations of defendant's agent that he would later fill it in properly, and was never read to the deceased so that he knew what he was signing. It is generally held that, when a person is unable to read a document which he signs, it is his duty to have the same read to him, if there is a person available who can read it, and that, if he neglects to have this done, he may not thereafter be heard to say that he did not assent to its provisions.

As was said in *First Nat. Bank* v. *Hall*, 129 Mo. App. 286, 108 S. W. 633:

"In our opinion the undisputed evidence shows defendant was guilty of gross carelessness. It is true he could not read, but his three sons and wife were at hand who could read. It was his plain duty to call on them to apprise him of the contents of the instrument presented for his signature before he signed it. His own testimony proved he did not even require Green to read all the paper he signed before he affixed

his signature; and he said he thought Green said it was a contract. Such carelessness cannot be excused at the expense of an innocent holder of negotiable paper. No fact appears which mitigates defendant's negligence in not having the paper read to him by some member of his family who was present, or at least read in full by Green. Defendant was not shown to have been infirm in mind or body; but on the contrary, was in full enjoyment of his faculties and of good intelligence. No relation of confidence or trust existed between him and Green, for all the circumstances show the latter was an entire stranger to defendant until this visit. We do not say that in every instance an illiterate man must ask some one, other than the party seeking his signature to an instrument, to read it before he signs it. In the case of one dealing with an old acquaintance and trusted friend carelessness might not be imputed if the signer was deceived by relying on the representations of the other party. The facts before us are different. It is generally, and we believe universally, held to be inexcusable carelessness for a person who can read an instrument to sign it without reading; and in such instances the signer, if it is a negotiable note, cannot defend against an action brought by an innocent holder on the ground of fraud in procuring his signature. If a man cannot read, and members of his family are standing by who can, it is as easy to have them read a paper as it would be to read it himself; and certainly when he contents himself with a partial reading by a total stranger, he is in fault."

*Upton* v. *Tribilcock,* 91 U. S. 45, 23 L. Ed. 203; *New York Life Ins. Co.* v. *Fletcher,* 117 U. S. 519, 6 Sup. Ct. 837, 29 L. Ed. 934; *Bedell* v. *Herring,* 77 Cal. 572, 20 Pac. 129, 11 Am. St. Rep. 307; *Mackey* v. *Peterson,* 29 Minn. 298, 13 N. W. 132, 43 Am. Rep. 211; *Baldwin* v. *Barrows,* 86 Ind. 351; *Mutual Benefit etc. Assn.* v. *Ferrell,* 42 Ariz. 477, 27 Pac. (2d) 519.

The provisions of both the application and the policy in regard to the warranty of good health were already printed thereon at the time that the deceased

signed them, and it does not appear that the soliciting agent ever told him that the application and the certificate did not contain those provisions. The only thing which it is claimed the agent did was to write in the answers to certain specific questions which were contained in the application. Assuming that it be true that these answers were falsely and fraudulently answered by the agent, the printed matter in the application certainly was not placed therein by him, but was there when deceased signed it in the presence of his wife and niece, both of whom, had he asked them to read the printed instrument to him, could have done so. Further than that, although both were present when he signed the insurance certificate on March 1st, it is not claimed that he ever asked to have that read. We are of the opinion that, on the record, it appears affirmatively that the facts in this case bring it within the rule laid down in the foregoing cases, and that plaintiff may not be heard to claim that deceased signed the application and insurance certificate without knowing that he was warranting his good health both times. The trial court should have instructed the jury to return a verdict in favor of the defendant.

The judgment of the lower court is reversed, and the cause is remanded for a new trial in accordance with the principles laid down herein.

McALISTER and ROSS, JJ., concur.