706 P.2d 382

**Augustin V. TERAN and Soila Teran, husband and wife, Plaintiffs/Appellants,**

v.

**CITICORP PERSON–TO–PERSON FINANCIAL CENTER, an Arizona corporation, Defendant/Appellee.**

No. 2 CA–CIV 5135.

Court of Appeals of Arizona, Division 2.

March 26, 1985.

Reconsideration Denied May 8, 1985.

Review Denied Sept. 10, 1985.

Alpert, Fein & Hameroff, P.C. by James A. Fein, Tucson, and Arizona State University Law School Clinic by Lawrence B. Weeks, Steven A. Gruenemeier, Tempe, for appellants.

Smith & Curtis by Ted A. Smith, Paul C. Jacobson, Phoenix, for appellee.

## OPINION

BIRDSALL, Chief Judge.

This is an appeal from two summary judgments, both in favor of the defendant/appellee, Citicorp Person-to-Person Financial Center. The first judgment dismissed Counts 1, 2, and 4 of the complaint of the appellants, Augustin V. Teran and wife, Soila, and the second dismissed Count 5. Count 3 did not involve Citicorp, being against other defendants, SMK Investments, Inc. and Sydney M. Katz and his wife. That count was also summarily dismissed.

According to the documentary evidence before the trial court, the Terans, in 1978, borrowed $9,854 from Citicorp to pay off other debts they owed and to make certain improvements to their home. The money borrowed was:

| | |
|---|---|
| $5090 | owed Pacific Finance |
| 1000 | owed U.S. Credit Life |
| 3184 | for Terans |
| $9274 | |

An insurance premium of $580 brought the total to $9854. The loan was for 10 years and called for monthly payments of $165, a smaller monthly payment than the Terans had been paying before this consolidation.

The Terans signed a note, security agreement, deed of trust on their home, notice of right to rescind, and a request for life, health, and accident insurance.

Mr. Teran was a miner, and when the union went on strike, he had no work and failed to make his payments. In his affidavit, Mr. Teran says he called Citicorp and someone there, who remains unidentified, told him he did not have to make his payments during the strike.

In October 1980, Citicorp gave notice of default and election to sell under the deed of trust and the Terans' home was sold to SMK and Katz in January 1981, giving rise to the proceedings in the trial court.

The complaint, after two amendments, was in five counts. Count 3 made no claim against Citicorp. Count 1 alleged a defective notice and sale under the deed of trust; Count 2 alleged willful or negligent conduct; Count 4, a violation of civil rights, 42 U.S.C. § 1983; and Count 5 alleged consumer fraud.

The thrust of the appellants' case and this appeal arises out of the fact that they are Spanish-speaking and do not speak, read, or understand English. In their affidavits they assert that they did not realize they were giving their home as security for payment of the loan.

The actual issues as presented on appeal by the appellants are:

1. There were disputed material issues of fact precluding summary judgment.
2. The appellants should not be bound by the documents.
3. Citicorp was estopped from declaring the default because payments were waived.
4. Notice of the trustee's sale should have been given appellants in Spanish.
5. Failure to disclose that their home was the collateral for the loan was a consumer fraud violation.

We have attempted to state the facts in the light most favorable to the appellants, which is the appropriate standard of review when summary judgment has been entered in the trial court. We are handicapped because of the appellants' total failure to comply with Rule 13(a)(4), Rules of Civil Appellate Procedure, 17A A.R.S., which requires specific citations to the record.

In order to discuss the first issue presented, it is necessary to also relate the facts pertaining to the loan transaction and the execution of the documents. The Terans had first gone to another lending institution to borrow funds to pay for the desired insulation in their home from Golden West Insulation. That lender would not finance the project because of the prior purchase money mortgage and the exist-

ence of two prior deeds of trust given on the home by the Terans, one to U.S. Credit Life and the other to Pacific Finance. The Terans and Golden West were referred to Citicorp. Golden West presented all the information to Citicorp for the Terans and the loan was approved and the necessary documents prepared. A Spanish-speaking salesman for Golden West and the Terans then went to the Citicorp office for the purpose of completing the transaction. At that time the documents were signed, the other debts were paid, the prior deeds were released, and the Terans got their money after the three day waiting period.

The appellants argue that there are twelve disputed fact questions as follow:

1. Whether at the time of the transactions in dispute, appellants comprehended the difference between a deed of trust instrument and a mortgage instrument.

2. Whether the appellants understood at the time of the transactions here in question, the significance of legal instruments provided for by state and federal law, which made their home equity security for a money loan.

3. What legal relationship existed, if any, between the Terans and the representative from Golden West Insulation Company, known only as "Alex," at the time of the loan transaction here in dispute.

4. What legal relationship, if any, existed between appellee Citicorp and "Alex" of Golden West Insulation Company at the time of the transaction here in question.

5. Whether full disclosure and explanation in the Spanish language of the various loan documents associated with the transaction occurring in April and May 1978, were required by appellee Citicorp for the benefits of appellants herein; and further, whether such disclosure and explanation were in fact appropriately and properly made.

6. Whether any misrepresentations, concealments, or omissions occurred in the May 31, 1978, loan presentation to the appellants, by appellee Citicorp or its duly authorized agents and representatives.

7. Whether in fact the substance, terms, and provisions of the deed of trust securing the appellee Citicorp loan were made known in a meaningful fashion to the appellants herein.

8. Whether the Terans knowingly and intelligently assumed excessive financial obligations as a result of appellee Citicorp's encouragement.

9. Whether appellee Citicorp deviated from its own established policies and practices at the time of negotiations and consummation of the loan with the Terans in May 1978.

10. Whether representations were made by agents of appellee Citicorp, at any time, that appellants could safely *not* make payments on their loan obligation during Mr. Teran's unemployment between July 1980 and February 1981.

11. The actual cost appellee Citicorp would have had to incur to provide notice of trustee's sale to the Terans in Spanish as well as English.

12. When in fact appellants learned that their home would be sold at a trustee's sale.

For different reasons we reject each of these questions as excuses for avoiding summary disposition of the appellants' complaint. In order to discuss questions one through seven, we must review the Arizona law and review additional facts concerning the meeting at Citicorp when the loan documents were signed. The general rule holds that one who signs a written document is bound to know and assent to its provisions in the absence of fraud, misrepresentation, or other wrongful acts by the other party. Nothing before the trial court even permitted any inference that Citicorp committed any fraud, misrepresentation, or wrongful act. The appellants received exactly that which the documents set forth. Thus, assuming arguendo that the appellants did not understand the documents or their legal significance, these fact questions are not material unless Citicorp undertook the responsibility to explain

the documents to the Terans and, either intentionally or negligently, failed to adequately perform that undertaking. No facts presented to the trial court suggest that Citicorp attempted to interpret the documents for the Terans, or that Citicorp furnished the interpreter as they would have if they had used their own employee. The only facts bearing on this question come from Mr. Teran's two affidavits and the deposition of Mr. Larry May, the branch administrator of Citicorp who handled the transaction. In his first affidavit, Mr. Teran says only:

"2. That on May 31, 1978, they went to the office of the defendant CITICORP to borrow certain funds. At that time, they met with an employee of CITICORP whose name is LARRY MAY. They were given certain documents in English to sign. These documents were signed in the presence of LARRY MAY and another person. *The documents were not explained to them in Spanish* and they were not aware that they signed a Deed of Trust on their property. They were not informed that if they fell behind in their payments they would lose their house.

3. That the employees of CITICORP knew that they did not speak, read or write English. If the documents had been explained to them and they had understood that they were signing a Deed of Trust on their property, they would not have borrowed this money." (emphasis added)

In his second affidavit, Mr. Teran goes into more detail:

"(8) That on or about April 26, 1978, he entered into a retail installment sales contract with the predecessor in interest of said contract of Defendant CITICORP, a company named Copper Country dba Golden West Insulation Co.; that as part and parcel to said transaction, he was required to sign the above-said contract as well as a Deed of Trust permitting Golden West to secure the contract with the Affiant's home; that at no time was it clearly or otherwise, explained to him by agents of Golden West what the legal and practical significance of said Deed of Trust truly was;

(9) That at the request of a representative and agent of Golden West, his true name being unknown at this time, and who will hereinafter be referred to by his stated surname, "Alex", the Affiant went with his wife SOILA, to the offices of Defendant CITICORP located at the El Con Mall in Tucson, for the expressed purpose of borrowing funds to pay for the retail installment contract previously negotiated with Golden West, and to borrow funds under an arrangement already negotiated with Alex ostensibly on their behalf, to pay off other creditors of Affiant; that this singular visit to Defendant CITICORP's office took place on or about May 31, 1978;

(10) That all discussions with the representative agent of Golden West, Alex, telephonic and personal, were conducted exclusively in the Spanish language;

(11) That upon entering the offices of Defendant CITICORP, he and his wife were directed by CITICORP's Larry Mary [sic] to sign certain documents already prepared, in English; that no translator or other intermediary or third party was present; that no direct and real verbal communication in English or Spanish was ever established between CITICORP's May and Affiant or his wife;

(12) That numerous documents were signed by him upon the prior assurance of Golden West's Alex that their signatures were all that remained to be done before they could have the insulation work performed by Golden West and two (2) outstanding loans paid off;

(13) That at no time during their previous discussions with Alex, or during their visit of May 31, 1978 or thereabout, to Defendant CITICORP's office, was explanation offered as to the legal or practical significance of Defendant CITICORP's proferred new Deed of Trust, the Note, Security Agreement, or the Notice of Right to Recision;

(14) That the only definitive information communicated to the Affiant, which communication was by Alex and not Mr. May, was the fact that by the act of signing the documents placed before him by Mr. May, he would be able to receive sufficient funds to pay Affiant's existing obligations to Pacific Finance Co., U.S. Life and Credit Co., and the retail installment sales contract which would now be owned by Defendant CITICORP;

(15) That neither he nor his wife were informed by anyone in a language they could comprehend and understand, that if they fell behind in their monthly payments to the Defendant CITICORP, they would be in jeopardy of losing their home in a physical sense as well as the financial equity they had invested therein;

(16) That at all times during the initial and only visit to CITICORP's offices, no one was present to translate and explain to them the contents of the documents requiring their signatures; that the manager of CITICORP's El Con Office, Larry May, actually knew they did not read, speak or write the English language; that if the documents placed before them for signature had been adequately explained to them beforehand, particularly the significance of the Deed of Trust, they would never have borrowed the money;

(17) That at no time did Larry May of CITICORP produce an employee of his own office to assist in the translation; that at no time during the Plaintiffs' visit to the CITICORP office did Larry May suggest to the Affiant or his wife that they bring an adult with bi-lingual ability to inform them of the significance of their acts;"

In his deposition, Mr. May describes the meeting in his office:

"Q Who came in as far as the Terans? Did they both come, the husband and the wife?

A Mr. and Mrs. Teran and the salesman from Golden West.

  *   *   *   *   *   *

Q You can't remember the salesman's name?

A No, sir, because that's the only time I ever met him. It indicates on my application that it was probably Alex.

  *   *   *   *   *   *

Q And Alex you think is the salesman?

A Yes, sir, I think that was his name.

Q Tell us what happened on May 31 when they came in.

A Okay. Well, we introduced ourselves and sat down at a round table and we asked them for identification, asked them for two personal references.

I went over the loan documents in the Terans presence with the salesman from Golden West and I told him, you know, that I did not speak Spanish, that it would be necessary for him to explain everything to them that I was going over with him.

  *   *   *   *   *   *

Q You said that there was some guy, Alex, acting as an interpreter. Were you going through these forms with the customers, the Terans, and he was translating what you were saying to them? Is that how it worked?

A Yes. I went over each item. I would go over like the disbursements. He would then point to the documents, the figures, and—

Q Talk to them in Spanish?

A —talk to them in Spanish and they would acknowledge indicating that they understood this, understood this and they understood the total disbursements, you know.

Q How could you tell that? Were they shaking their heads?

A They were shaking their heads and seemed like they were acknowledging what he was telling them.

Q Okay.

A You know, I pointed out the—

Q Did you do the same thing with the Deed of Trust?

A Yes, sir.

Q  What did you tell them with regard to the Deed of Trust?

A  I told them that this was the Deed of Trust which essentially put a second mortgage, similar to a second mortgage, on the property and that we were paying off the present second mortgage that they had with Pacific Finance and we were filing a new lien in the amount of $9,854.96.

Q  This man that came in with them, he was telling them that in Spanish?

A  Yes, sir.

Q  You did that with the other form? What was the other form you talked about, the Notice of—

A  —Notice of Right to Rescind.

We went over that in great detail because that gave them three business days in which they could change their mind and back out.

Q  And the salesman again explained that form to them?

A  Yes, sir.

Q  And their rights under that form?"

Even considering these facts in the manner most consistent with the appellants' arguments, there is no way to conclude that Citicorp either attempted to interpret the documents for the Terans or selected the interpreter.

■  The law in Arizona is clear that the appellants were obligated to secure interpretation of the documents. *Betancourt v. Logia Suprema De La Alianza Hispano-Americana*, 53 Ariz. 151, 86 P.2d 1026 (1939). And see *Condos v. United Benefit Life Insurance Co.*, 93 Ariz. 143, 379 P.2d 129 (1963); *Sovereign Camp of the Woodmen of the World v. Daniel*, 48 Ariz. 479, 62 P.2d 1144 (1936); and *Mutual Benefit Health and Accident Association v. Ferrell*, 42 Ariz. 477, 27 P.2d 519 (1933). In the instant case the Terans had a Spanish-speaking interpreter, albeit he was the insulation salesman.

In "fact questions" three and four, the appellants question the legal relationship of the salesman, Alex. They would have us infer that because he was not a disinterested party, he was dishonest. No such infer-

ence is permissible. Again, no misrepresentation, no overreaching, no fraud is shown. Nothing suggests there was any "legal relationship" between Alex and Citicorp. If three and four are fact questions, they are likewise immaterial.

We fail to see the legal significance of question eight. If every borrower has a cause of action when he is encouraged to borrow more than he should, the courts will become even more crowded. No authority is cited for the proposition that one's lack of knowledge or intelligence concerning financial transactions permits him to recover from the party with whom he does business.

Turning to question nine, the facts before the trial court show that Citicorp did deviate from its own practice in that when doing business with a Spanish-speaking customer it usually furnished one of its Spanish-speaking employees to interpret. Obviously it did not do this since the insulation salesman who came with the Terans was available. Again, the materiality of this fact has not been shown. Indeed, under the appellants' reasoning, if Citicorp had used their own employee, they might be liable for this interpretation of the documents.

■  Question ten concerns the appellant Augustin Teran's statement in his affidavit that he "contacted representatives" of the Citicorp office "to explain the situation and they said to him, in effect, 'do not worry about a default, just begin making payments when the strike is over.'" The problem with this assertion is that it is insufficient to create a fact question. Mr. Teran does not state the identity of the "representatives" to whom he allegedly spoke. Since the identity is unknown, their authority to bind Citicorp cannot be shown. His bare averment, absent other detail, is insufficient to justify a trial of that issue. See *Schock v. Jacka*, 105 Ariz. 131, 460 P.2d 185 (1969); *Markel v. Transamerica Title Insurance Co.*, 103 Ariz. 353, 442 P.2d 97, cert. denied, 393 U.S. 999, 89 S.Ct. 484, 21

L.Ed.2d 463 sub nom. *Phoenix Title & Trust Co. v. Markel,* (1968).

The final two questions of fact are immaterial in view of our disposition of the § 1983 claim.

Turning now to the legal issues presented, the appellants first contend that they should not be bound by the documents they signed. It is important to briefly state what this case is not. It is not a case of a finance company taking advantage of a poor non-English-speaking couple. Although we may generally be predisposed to dislike the high interest rates charged to persons who must resort to such methods of financing—15.98% annual rate in this transaction—nothing suggests any illegality. Although we may also be generally predisposed to protect a consumer who cannot read, speak, or understand English, nothing suggest that a big, bad finance company took advantage of these consumers. Although we may generally be quick to protect a couple who, apparently because of a run of hard times, lost their home, there is again nothing to suggest any illegality in what occurred. There are no facts from which we can find or infer that the Terans should not be bound by the documents they signed. Nor is this a case involving any fiduciary relationship, mistake, or inadequate consideration. Compare *Southern Pacific Co. v. Gastelum,* 36 Ariz. 106, 283 P. 719 (1929). The transaction was purely contractual in nature. There was no misconduct on the part of Citicorp. Compare *Hofmann Co. v. Meisner,* 17 Ariz.App. 263, 497 P.2d 83 (1972). If there was a mistake (the Terans' failure to understand their home was security for the debt), it was unilateral only, and cannot afford ground for relief. See *Nationwide Resources Corp. v. Massabni,* 134 Ariz. 557, 658 P.2d 210 (App.1982).

We have previously rejected the estoppel and waiver theory because the proof offered is insufficient to create a fact question.

■ Turning now to the alleged § 1983 violation, the appellants contend that because SMK and Katz utilized the sheriff to secure possession of the home they had purchased at the sale pursuant to the deed of trust, state action occurred; or alternatively, that the Arizona legislature, by adopting legislation permitting the use of deeds of trust, A.R.S. §§ 33–801 to 821, has engaged in such action. For either reason they conclude the notice of sale should have been given in Spanish. We disagree. Although the statutes regulate a trustee's sale, the power of sale is set forth in the contractual agreement. The sale is strictly private, as are the proceedings leading to it. The issue presented has already been decided by the United States District Court in Arizona. In *Kenly v. Miracle Properties,* 412 F.Supp. 1072 (D.Ariz.1972), a three-judge panel held that the Arizona statute did not involve sufficient state action so as to invoke due process guarantees under 42 U.S.C. § 1983. See also *Niedner v. Salt River Project Agricultural Improvement and Power District,* 121 Ariz. 331, 590 P.2d 447, (1979), and *Dimond v. Samaritan Health Service,* 27 Ariz.App. 682, 558 P.2d 710 (1976).

There are at least three other federal cases involving extra-judicial foreclosure or repossession statutes and proceedings, each of which supports the summary disposition of the § 1983 count by the superior court. *Barrera v. Security Building & Investment Corp.,* 519 F.2d 1166 (5th Cir. 1975) (involving Spanish-speaking migrant workers); *Bryant v. Jefferson Federal Savings and Loan Assoc.,* 509 F.2d 511 (D.C.Cir.1974) (mortgage foreclosure); and *Adams v. Southern California First National Bank,* 492 F.2d 324 (9th Cir.1973), cert. denied, 419 U.S. 1006, 95 S.Ct. 325, 42 L.Ed.2d 282 (1974) (automobile repossession).

But, the appellants argue, the Arizona statute, like A.R.S. § 12–2406(C), the provisional remedy statute, should have required notice in both English and Spanish. We do not agree. The state is directly involved in the taking of property through provisional remedies. It is undoubtedly for that reason that Spanish notice was required by the Arizona legislature. It is not

required in many other notice requirements contained in other legislation.

The federal courts have likewise held that Spanish-speaking persons are not deprived of equal protection or due process in other state actions. *Frontera v. Sindell,* 522 F.2d 1215 (6th Cir.1975) (civil service examinations); *Carmona v. Sheffield,* 475 F.2d 738 (9th Cir.1973) (unemployment benefits).

■ The last issue presented is a private action under our consumer fraud statute. The alleged fraud is the concealment of the contract rights created by the documents by failing either to have them printed in Spanish or to provide an interpreter. That occurred in May 1978. The lawsuit was not commenced until March 1981. The Consumer Fraud Act statute of limitations is one year. *Murry v. Western American Mortgage Co.,* 124 Ariz. 387, 604 P.2d 651 (App.1979). The statute commences to run when the fraud was, or could have been, discovered. The Terans could (should) have discovered the alleged wrongdoing immediately. An Arizona case on point is *Condos v. United Benefit Life Insurance Co.,* supra. The fraud count is barred by the statute.

By separate motion, attorney fees have been requested. In our discretion, we deny that request and refuse to assess fees against the appellants.

Affirmed.

HOWARD and HATHAWAY, JJ., concur.