[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

Nos. 17-13956; 17-15623
_____

D.C. Docket No. 9:16-cv-80567-WPD


PIER 1 CRUISE EXPERTS,
a Brazil corporation,

                                        Plaintiff-Appellee-Cross-Appellant,

versus

REVELEX CORPORATION,
a Florida corporation,

                                        Defendant-Appellant-Cross-Appellee.

_____

Appeals from the United States District Court
for the Southern District of Florida
_____

(July 11, 2019)

Before WILLIAM PRYOR and NEWSOM, Circuit Judges, and VRATIL,* District
Judge.

---

* Honorable Kathryn H. Vratil, United States District Judge for the District of Kansas, sitting by
designation.

NEWSOM, Circuit Judge:

Dear Florida Supreme Court:  We need your help.  Among other much simpler issues, this case presents a knotty and important state-law contract question that is more appropriately answered by you than by us.  Accordingly, after clearing away some underbrush, we will respectfully certify to you the following question:

> Is a contractual "exculpatory clause" that purports to insulate one of the signatories from "any … damages regardless of kind or type … whether in contract, tort (including negligence), or otherwise" enforceable?  Or, alternatively, does the clause confer such sweeping immunity that it renders the entire contract in which it appears illusory?  Or, finally, might the clause plausibly be construed so as to bar some but not all claims and thus save the contract from invalidation?

Each possibility finds at least some support in Florida law, each comes with its own equitable pros and cons, and each has dramatically different implications for the case before us.

## I

### A

Pier 1 Cruise Experts is a Brazilian travel agency that specializes in cruises and cruise packages.  Pier 1 sells both through sub-agencies—approximately 300 individual travel agencies located around Brazil—and directly to customers.  Hoping to grow its business, Pier 1 wanted a first-of-its-kind website with an online distribution channel for booking options in Portuguese and payment in Brazilian reais.

2

To build the website, Pier 1 hired Revelex Corporation, a Florida-based company that provides customized software to travel companies. Revelex promised to deliver on each of Pier 1's requirements—content in Portuguese, prices in reais, and sub-agent booking capabilities—and indicated that, once work started, the website software could be completed in approximately six months.

Almost a year later, following multiple rounds of negotiations, the two companies executed a Service Agreement. The Service Agreement was dated August 6, 2013—for reasons we'll explain, the date could turn out to matter—and in general, it stated that Revelex would provide Pier 1 access to a proprietary booking engine in exchange for licensing fees. Section 12 of the Service Agreement, titled "Limitation of Liability," is at the heart of this litigation, so we'll pause to take a closer look at its three constituent provisions. First, and most importantly here, § 12.1 sets forth an unusually broad exculpatory clause. In relevant part, that clause reads as follows:

> Revelex shall not be liable … for any direct, special, indirect, incidental, consequential, punitive, exemplary or any other damages regardless of kind or type (whether in contract, tort (including negligence), or otherwise), including but not limited to loss of profits, data, or goodwill, regardless of whether Revelex knew or should have known of the possibility of such damages …. Customer waives any and all claims, now known or later discovered, that it may have against Revelex and its licensors and vendors arising out of this agreement and the services.

Second, § 12.2 provides that "[i]n any event, Revelex's total cumulative liability to customer or any third party for all damages, losses, and causes of action (whether in contract, tort (including negligence), or otherwise) relating in any way to this agreement exceed one hundred dollars ($100.00)."  If § 12.2 seems a little clunky, that's because it is.  No matter how you read it, the grammar just doesn't work, and the parties here dispute whether the provision is missing a "shall not" between the words "agreement" and "exceed."  Finally, § 12.3 states, in relevant part, that "[t]he limitations of liability and disclaimers of warranties provided in this agreement form an essential basis of the bargain between the parties."

Separately (but alongside) the Service Agreement, the parties also negotiated and executed a Scope of Work, which we'll (inelegantly) call the "SOW."  The SOW memorialized the necessary customizations for the website and indicated that the total cost of the software was $100,097.  It explained that the website would entail two primary components—a business-to-business feature that would allow travel agents to book and manage cruise reservations, and a direct-to-consumer feature that would enable customers to book and pay for cruises online.  Notably— and potentially importantly, for reasons we'll explain—the Service Agreement and the SOW included reciprocal cross-references.  Section 5.1 of the Service Agreement contemplated that the parties would "enter into written Statement(s) of Work … for the performance of certain professional services by Revelex."  Section

4

7 of the SOW, in turn, stated that it was "issued pursuant to the terms and conditions of the Contract"—*i.e.*, the Service Agreement—and that "the services set forth within this [SOW] are within the scope of the services authorized in the Contract." Also notably—again, for reasons that will become clear—discussions concerning the SOW overlapped the negotiations and execution of the Service Agreement; the parties began conferring about the SOW on April 22, 2013, executed the Service Agreement on August 6, 2013, and then finalized the SOW on January 15, 2014.

As of December 2015, the software still wasn't complete. Pier 1 ceased making its ongoing licensing payments, and Revelex terminated Pier 1's access to the software.

**B**

Pier 1 sued Revelex in the Southern District of Florida, raising four claims: breach of contract, fraudulent misrepresentation, negligent misrepresentation, and unjust enrichment. Pier 1 eventually dropped its fraudulent-misrepresentation and unjust-enrichment claims, so we focus here on breach of contract and negligent misrepresentation.

The parties filed dueling motions for summary judgment, each contending that § 12.1 of the Service Agreement should be read in its favor. For its part, Revelex argued that the exculpatory clause—which, again, purported to shield it

5

from "any … damages regardless of kind or type … whether in contract, tort (including negligence), or otherwise"—barred Pier 1's claims. The breadth of the clause's language, Revelex's president explained in his deposition, was intentional: "Revelex is priced in the manner with which we cannot afford to take on any liability. It is a pay-as-you-go service. So the customers that use our service benefit from paying less. What that means is that we are not going to be financially liable. Your remedy with us is to not do business with us." Alternatively, Revelex asked the district court to correct a scrivener's error in § 12.2—so as to insert the phantom "shall not"—and cap its exposure at $100, or, as a last resort, to construe the exculpatory clause to limit its liability to direct damages only. Finally, Revelex asserted that the SOW couldn't stand independently of the Service Agreement and, therefore, that Pier 1's SOW-based claims provided no stand-alone basis for relief.

Pier 1, by contrast, principally asserted that the Service Agreement's broad exculpatory clause rendered the contract unenforceable against Revelex and thus illusory. Separately, and in response to Revelex, Pier 1's managing director testified that he believed § 12.1 merely shielded Revelex from liability to third parties for damages caused by Pier 1 or its sub-agencies. As for § 12.2, he testified that it actually limited Pier 1 to seeking damages *in excess* of $100—which, he

6

said, "seemed reasonable" because "any problems less than $100 would not be worth pursuing."

The district court granted partial summary judgment for Pier 1 and held that, as a matter of law, the exculpatory clause rendered the entire Service Agreement illusory. As the court explained it, "the Service Agreement binds [Pier 1] to perform certain duties," but Revelex "is free to breach the contract because there will never be recourse for the breach"; accordingly, the court concluded, the "arrangement does not create a binding contract." Without mutuality of obligation, the court reasoned, "there is no valid contract and neither side may be bound." The court refused to reform or sever § 12.1, because it said that it could not "re-write or sever th[e] provision in a way that would achieve the intent of the parties."

Both parties sought clarification with respect to whether the SOW was part and parcel of the (now nonexistent) Service Agreement or, instead, survived independently. The district court issued a supplemental order reiterating that the entire Service Agreement was unenforceable both (1) because § 12.1 rendered the contract illusory, and (2) in the alternative, because it was "an unenforceable agreement to agree." The court clarified, though, that its earlier order "didn't speak to the claim for breach of contract related to the SOW," which the court explained survived as a separate contract independent of the Service Agreement.

7

The case then proceeded to trial on a SOW-related breach-of-contract claim and a negligent-misrepresentation claim. At trial, Pier 1 presented a live demonstration of the software, which revealed that key functionalities were never completed. For example, Pier 1 showed that although the website logged more than 10,000 visits, not a single potential customer was able to purchase a cruise. Revelex nonetheless asserted that it had satisfied its contractual obligations—pointing, for instance, to an email from Pier 1's principal stating that "I'm hereby to confirm that all services described on SOW were done." Pier 1 countered that it sent the email because Revelex had requested it for its auditors—not because Pier 1 actually believed that Revelex had fulfilled its contractual duties.

Through its financial manager, Mariana Peres, Pier 1 presented damages evidence pertaining to alleged lost profits. Using Pier 1's financial reports and general economic conditions, Peres determined that Pier 1's expected revenue during the damages period was $12.7 million. She estimated that total expenses would have increased by 10% annually over the same timeframe, and then compared that to the inflation rate in Brazil. Peres calculated that, on average, each cruise that Pier 1 sold generated $1,000 in revenue. Pier 1 was selling 50 cruises per month before the advent of online booking capabilities, Peres said, and she estimated that a properly functioning website would have increased sales by at least 100 cruises per month, to a total of 150.

8

Having heard Peres's testimony, the district court asked her to clarify her methodology.  When Peres explained that her estimates were based, in part, on the e-commerce market in Brazil, Revelex objected that she, as a lay witness, was impermissibly offering expert testimony.  The court held that although Peres could "give an opinion as to what her company is worth, or what the expenses were," it was "too speculative" for her to "pick a number out of thin air" and determine that sales would double "based on looking on the internet and looking at e-commerce." Because Pier 1 introduced no additional evidence pertaining to lost profits, the court granted judgment as a matter of law for Revelex with respect to Pier 1's lost-profits claim.

Pier 1's SOW-based breach-of-contract claim and its negligent-misrepresentation claim were submitted to the jury.  The jury found that Revelex (1) breached the SOW and (2) made negligent misrepresentations to Pier 1.  It awarded Pier 1 $100,097 in damages—the software cost as specified in the SOW. Because the district court had concluded that the Service Agreement was void— and because there was therefore no valid contract clause on which to predicate attorneys' fees—it denied Pier 1's request for $485,779.50 in fees.

Revelex appealed the district court's entry of judgment against it, and Pier 1 cross-appealed the court's rejection of its lost-profits claim and its fee request.

9

## II

There's a lot going on here.  We have an appeal and a cross appeal, and together the parties have presented a series of interconnecting issues.  Three of those issues are pretty straightforward, and we feel well-equipped to decide them.  The fourth issue, however—in candor, the biggest and hardest one—is better resolved by the Florida Supreme Court than by us, and so we will certify it.[1]

## A

We can make relatively quick work of three issues: (1) Revelex's contention that the district court erred in concluding that the SOW is independent of, and therefore survived that court's invalidation of, the Service Agreement; (2) Pier 1's contention that the district court erred in rejecting its claim for lost profits; and (3) Pier 1's contention that it is entitled to recover attorneys' fees.  In short, we reject all three arguments.

## 1

First up:  The district court held that the SOW was an independent, stand-alone contract that survived Service Agreement's demise.  Revelex disagrees; it says that the SOW is bound up with the Service Agreement and therefore must fall

---

[1] We review *de novo* questions of contract interpretation, *Hegal v. First Liberty Ins. Corp.*, 778 F.3d 1214, 1219 (11th Cir. 2015), as well as a district court's entry of judgment as a matter of law, *Connelly v. Metro. Atlanta Rapid Transit Auth.*, 764 F.3d 1358, 1363 (11th Cir. 2014).  As the parties agree, Florida law governs the contracts between Pier 1 and Revelex.

10

with it.  Revelex has a pretty good story to tell, and if we were writing on a clean slate we might be inclined to agree that the district court erred in treating the SOW as wholly independent of the Service Agreement.  But for reasons we'll explain, we aren't, and so we can't.

Under Florida law, "[d]ocuments executed by the same parties, on or near the same time, and concerning the same transaction or subject matter are generally construed together as a single contract."  *Quix Snaxx, Inc. v. Sorensen*, 710 So. 2d 152, 153 (Fla. 3d Dist. Ct. App. 1998).  Moreover, "[w]here a writing expressly refers to and sufficiently describes another document, the other document, or so much of it as is referred to, is to be interpreted as part of the writing."  *Id.* (citing *United States Rubber Prods., Inc. v. Clark*, 200 So. 385, 388 (Fla. 1941)).

Applying those principles here would seem to suggest that the SOW is indeed part and parcel of the Service Agreement.  As we have explained, the two contracts were negotiated and executed during the same basic timeframe.  The chronology, again, is essentially as follows:  Pier 1 and Revelex began negotiating the Service Agreement in mid-2012, commenced negotiations on the SOW in April 2013, executed the Service Agreement in August 2013, and finalized the SOW in January 2014.  What's more, the two contracts cross-reference one another, further suggesting interdependency.  Section 5 of the Service Agreement expressly

11

contemplates "Statement(s) of Work," and § 7 of the SOW provides that it was "issued pursuant to the terms and conditions of" the Service Agreement.

The problem for Revelex, and it's a fatal one, is that it has waived any argument that the SOW can't stand alone—or, what amounts to the same thing, it invited the district court's error in concluding otherwise, or is judicially estopped from now contesting that court's determination.  At trial, when it sought judgment as a matter of law on Pier 1's unjust-enrichment claim, Revelex *expressly conceded* that the SOW was a valid agreement.  Here's the full colloquy:

> [REVELEX'S COUNSEL]: Judge, there's three theories that … currently exist. … There's a breach of contract relative to the scope of work, negligent misrepresentation, and a third alternative theory on unjust enrichment.  Under the law, if there is a contract, there can't, by definition, be unjust enrichment.
>
> I think, in all fairness, there's been an established contract in the scope of work, and we're no longer contesting that the scope of work is not a contract.  Therefore, if there is—the question is gonna be whether there's a breach of that contract ….
>
> THE COURT: So, what you're saying is, I can tell the jury that a valid contract was entered, and if I do that, then it eliminates the unjust enrichment alternative?
>
> [REVELEX'S COUNSEL]: Yes, Judge.

Based on its stipulation that the SOW had survived as a valid contract, the district court granted Revelex's motion for judgment as a matter of law and dismissed Pier 1's unjust-enrichment claim.  Having led the district court down the primrose path—and, in doing so, having succeeded in knocking out one of Pier 1's

three remaining claims—Revelex cannot now ask us to hold the district court in error for following.  *See Pensacola Motor Sales Inc. v. Eastern Shore Toyota, LLC*, 684 F.3d 1211, 1231 (11th Cir. 2012) ("A party that invites an error cannot complain when its invitation is accepted."); *cf. also New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) ("Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." (alteration adopted) (citation omitted)).

However strong its position may be that the Service Agreement and the SOW should rise or (more accurately) fall together, Revelex walked away from it, and it can't now walk back its walk-away.[2]

**2**

Next up: The district court granted Revelex judgment as a matter of law on Pier 1's claim for lost profits, concluding that Pier 1's supporting proof was impermissibly speculative and thus legally insufficient.  Pier 1 contests that conclusion, but we find no error in the district court's determination.

---

[2] While we can conclude without assistance that the SOW is a stand-alone, independent contract—or at least that Revelex is estopped from arguing otherwise here—we cannot conclude with any confidence that any SOW-based claim survives the Service Agreement's exculpatory clause.  Maybe so; maybe not.  *See infra* at 22–23.

13

To recover lost profits under Florida law, a plaintiff "must prove that 1) the defendant's action caused the damage and 2) there is some standard by which the amount of damages may be adequately determined." *W.W. Gay Mech. Contractor, Inc. v. Wharfside Two, Ltd.*, 545 So. 2d 1348, 1351 (Fla. 1989). The precise amount of lost profits needn't be definitively proven, but it must be "established with reasonable certainty." *Twyman v. Roell*, 166 So. 215, 217 (Fla. 1936). There must, in short, be "a reasonable yardstick by which to estimate the damages." *Nebula Glass Int'l, Inc. v. Reichhold, Inc.*, 454 F.3d 1203, 1217 (11th Cir. 2006); *see also Twyman*, 166 So. at 218. In any event, Florida law is clear that an award of lost profits "must be supported by evidence and cannot be based on mere speculation or conjecture." *Sampley Enters., Inc. v. Laurilla*, 404 So. 2d 841, 842 (Fla. 5th Dist. Ct. App. 1981). If "the terms conjecture and surmise too grandly describe the plaintiff's lost profits claim, the cases are legion that none can be recovered." *Stensby v. Effjohn Oy Ab*, 806 So. 2d 542, 544 (Fla. 3d Dist. Ct. App. 2001) (collecting cases).

Pier 1's lost-profits claim rested on the testimony of its financial manager, Mariana Peres, who was not tendered as an expert but rather appeared as a lay witness. Peres projected that if Revelex's software had worked, Pier 1 would "actually [have] double[d] the number of cruises" sold through online channels alone, which would have meant selling about one additional cruise per month

14

either directly or through its sub-agents.  Peres further testified that Pier 1 brings in revenue, on average, of $1,000 per cruise.  She also predicted a 10% increase in Pier 1's expenses.  Peres based her calculation on Pier 1's historical sales and its experience in the Brazilian cruise industry.  When Revelex objected that Peres, as a lay witness, was attempting to offer expert testimony, the district court agreed and cut off her testimony.  Pier 1 presented no other evidence pertaining to lost profits, and the district court later granted judgment as a matter of law against its lost-profits claim.

We agree with the district court's determination that Pier 1's lost-profits calculation was too speculative to proceed and that, without it, the evidence regarding lost profits was legally insufficient.  The district court correctly concluded that Peres seemed to have "decided to pick a number out of thin air" to conclude that Pier 1 could have sold "double[]" the number of cruises that sold through conventional means.  Peres's lone justification for her assertion that Pier 1 would have doubled its sales was that "[she] considered [it] a very reasonable [estimate] because [Pier 1] would have a new market" and "other distribution channels" with the new software.  To be sure, she testified that she did some "market research" on "e-commerce in Brazil," but she never explained why it was

15

reasonably certain that Pier 1 would sell twice as many cruises online as it had sold offline.[3]

Peres's calculation of Pier 1's increased expenses—10%—was also impermissibly speculative. She projected that expenses would grow as a result of both the costs of marketing the software's benefits and inflation in Brazil. With respect to her particular number, she testified that she "went ahead and added ten percent to all of [Pier 1's] expenses" because it "would be reasonable to have an additional ten percent in order to include all of the different market variations"— meaning "inflation and anything else that might come up." Peres testified that "it was [her] intent to be conservative with respect to the calculations," but her choice to peg the expense increase at 10% also seems to have come out of "thin air."

Because the district court cut Peres's testimony short, Pier 1's only surviving evidence of lost profits was its historical revenues and expenses. But from Pier 1's past *offline* sales the jury could only speculate about the profits it might have lost from missed *online* opportunities. For example, Pier 1 didn't establish how the jury could have concluded that the hypothetical individuals who would have bought cruises online were new customers, rather than old customers who had switched from offline to online purchasing. And because Pier 1 acknowledged that

---

[3] To be clear, Peres testified that Pier 1 was selling 50 cruises per month before the website, and that the website would "double" sales to 100 per month, independent of the existing offline sales. All told, that is actually a prediction that gross sales would *triple* to 150 per month.

no comparable businesses existed—it said that it would have been the first Brazilian travel agency to offer online bookings in Portuguese—it provided no "yardstick" by which the jury could calculate lost online sales. Finally, as the district court explained, unlike the ordinary lost-profits case, "[i]n this case, we're not talking about losing business; we're talking about not gaining business." Pier 1, that is, wasn't being denied existing sales as a result of Revelex's failure to deliver the customized software; customers could continue to book cruises over the phone or in person. Instead, Pier 1 had hoped to add a new method of distribution through online bookings, which it claimed Revelex had failed to deliver. Again, though, Pier 1 didn't present sufficient evidence by which the jury could calculate the resulting lost profits with reasonable certainty.

The district court correctly granted Revelex judgment as a matter of law on Pier 1's lost-profits claim.

**3**

Finally: Pier 1 contends that it is entitled to attorneys' fees. The district court denied Pier 1's fees motion because it held that the Service Agreement's exculpatory clause rendered the entire contract illusory and unenforceable—much more on that below—and, therefore, that § 4.3 of the Agreement, which speaks to fees, provided no basis for recovery.

The way we see it, no matter how the Service Agreement is interpreted, Pier 1 can't get attorneys' fees. If, in response to our certified question, the Florida Supreme Court concludes that the exculpatory clause rendered the Service Agreement unenforceable, then Pier 1 isn't entitled to fees for the reason the district court identified. *See Katz v. Van Der Noord*, 546 So. 2d 1047, 1049 (Fla. 1989) (holding that a party cannot recover attorneys' fees based on a provision of a contract that is deemed never to have been formed). And what if the Florida Supreme Court goes the other way and concludes that the Service Agreement is (in the main, anyway) enforceable? As to attorneys' fees, same result; the particular phrasing and scope of the Agreement's attorneys'-fees provision precludes Pier 1's fee request.

Pier 1 grounds its attorneys'-fees claim in § 4.3 of the Service Agreement. That provision commits Pier 1 "to pay all court costs, fees, expenses and reasonable attorneys' fees incurred by Revelex in collecting delinquent fees." On its face, anyway, § 4.3 doesn't operate in reverse—it doesn't require Revelex to pay fees to Pier 1 under any circumstances. Happily for Pier 1, the one-sidedness of § 4.3 isn't fatal, because Florida law permits court to engraft a reciprocity condition onto contractual attorneys'-fee provisions. In particular, Florida Statute § 57.105(7) provides that—

> [i]f a contract contains a provision allowing attorney's fees to a party when he or she is required to take any action to enforce the contract, the

court may also allow reasonable attorney's fees to the other party when that party prevails in any action, whether as plaintiff or defendant, with respect to the contract.

Fla. Stat. § 57.105(7). The Florida courts have held that § 57.105(7) aims "to even the playing field," which inures to Pier 1's benefit here. *Fla. Hurricane Prot. & Awning, Inc. v. Pastina*, 43 So. 3d 893, 895 (Fla. 4th Dist. Ct. App. 2010).

Sadly for Pier 1, Florida courts have also emphasized—in the same breath—that § 57.105(7) doesn't authorize them, in the name of enforcing reciprocity, to "expand … the terms of the agreement." *Id*. At most, then, § 4.3 can be read to provide a reciprocal right to collect attorneys' fees "incurred … in collecting delinquent fees." Reading § 4.3 to permit recovery of fees for breach-of-contract and negligent-misrepresentation, as Pier 1 asks, would be "tantamount to re-writing the contract between the parties"—which, Florida law makes clear, "we [may] not do." *Pastina*, 43 So. 3d at 895.

Accordingly, we hold that no matter how the Service Agreement is interpreted—that is, whether its exculpatory clause renders the entire Agreement illusory or not—Pier 1 is not entitled to recover attorneys' fees.

**B**

Which brings us to the biggie: How to handle the Service Agreement's exculpatory clause? That question tees up two subsidiary issues, which we'll address in turn: First, when and under what circumstances are exculpatory clauses

19

enforceable as a general matter?  And second, what is the effect of the particular—and particularly broad—exculpatory clause at issue in this case?

**1**

Although "not looked upon with favor" by Florida courts, *Ivey Plants, Inc. v. FMC Corp.*, 282 So. 2d 205, 208 (Fla. 4th Dist. Ct. App. 1973), an exculpatory clause is enforceable so long as (1) the contracting parties have equal bargaining power and (2) the clause's provisions are clear and unambiguous, *see Cooper v. Meridian Yachts, Ltd.*, 575 F.3d 1151, 1168 n.9 (11th Cir. 2009) (citing *Key Biscayne Divers, Inc. v. Marine Stadium Enters., Inc.*, 490 So. 2d 137, 138 (Fla. 3d Dist. Ct. App. 1986)).  With respect to the latter requirement, "the intention to be relieved from liability [must be] made clear and unequivocal and the wording must be so clear and understandable that an ordinary and knowledgeable person will know what he is contracting away."  *Cain v. Banka*, 932 So. 2d 575, 578 (Fla. 5th Dist. Ct. App. 2006).  In the same vein, exculpatory clauses are "strictly construed against the party seeking to be relieved of liability."  *Id.* at 580.

So far as we can tell—and we've been given no reason to think otherwise—Pier 1 and Revelex had equal bargaining power.  And the exculpatory clause that they executed as part of the Service Agreement provision is crystal clear.  Section 12.1 expressly insulates Revelex from "any … damages regardless of kind or type … whether in contract, tort (including negligence), or otherwise."  Moreover, as

20

we have emphasized, the record reflects that the clause's language was no accident; rather, it unambiguously communicated Revelex's intent to disclaim all liability. Recall that Revelex's president explained that his company "c[ould not] afford to take on any liability" and thus was "not going to be financially liable."

We accept, therefore, that the Service Agreement's exculpatory clause is not invalid as a matter of public policy.

**2**

The much tougher question, to which we now turn—and which we will certify to the Florida Supreme Court—is whether the exculpatory clause is enforceable here. We see three possibilities, all of which find some support in Florida law and (or really *but*) have dramatically different consequences for this case. First, there is Revelex's position: The clause should simply be enforced according to its terms to bar all of Pier 1's claims. Second, there is Pier 1's (and the district court's) position: Read for all it's worth, the exculpatory clause immunizes Revelex from essentially all liability and thereby renders the entire Service Agreement illusory and void *ab initio*. Finally, there is an in-between position: To avoid the illusoriness problem, the clause should be construed to bar only negligence claims, not breach-of-contract claims. We will explore each

21

possibility briefly before formally certifying the question to the Florida Supreme Court.[4]

**a**

The way Revelex sees it, this is an easy case.  The Service Agreement's exculpatory clause should simply be enforced according to its plain terms—which, again, both (1) insulate Revelex from "any … damages regardless of kind or type … whether in contract, tort (including negligence), or otherwise," and (2) clarify that Pier 1 has "waive[d] any and all claims … that it may have against Revelex … arising out of this agreement and the services."  Enforcement of the exculpatory clause could take either of two slightly different forms: broad and broader.  On the first (broad) reading, the clause would knock out both Pier 1's negligent-misrepresentation claim and any breach-of-contract claim grounded in the Service Agreement—but not necessarily a contract claim grounded in a separate

---

[4] We said that there were three possibilities.  There is perhaps a fourth.  In the district court, Pier 1 contended that the Settlement Agreement's exculpatory clause should be severed, and the remainder of the contract enforced, pursuant to § 16.7, which states in relevant part that "[i]f any provision of this Agreement is held to be invalid or unenforceable for any reason … the remaining provisions … shall remain in full force and effect and shall be binding on the parties hereto."  Pier 1 mentions but does not press its severance argument on appeal, and Revelex vigorously contends that severance would be improper because the Settlement Agreement states that the exculpatory clause is "an essential basis of the bargain between the parties …." Settlement Agreement § 12.3.  We are inclined to agree with Revelex that severance would be improper here, *see, e.g.*, *Local No. 234 v. Henley & Beckwith, Inc.*, 66 So. 2d 818, 821–22 (Fla. 1953) (holding that severance is appropriate only "where the illegal portion of the contract does not go to its essence" and that severability "depends upon the intention of the parties" as discerned, in part, "by a fair construction of the terms and provisions of the contract itself"), but we leave the final determination of the issue to the Florida Supreme Court.

agreement, such as the SOW.[5]  On this reading, the exculpatory clause's second sentence—noting Pier 1's waiver of claims "arising out of this agreement and the services"—cabins the clause's reach vis-à-vis contract claims to those emanating from the Settlement Agreement, in which the clause resides.  There is also, though, a second, more sweeping interpretation.  The clause's first sentence—immunizing Revelex from "any … damages regardless of kind or type … whether in contract, tort (including negligence), or otherwise"—is framed broadly enough that it might be understood to reach beyond the Service Agreement's four corners to cover and negate Pier 1's SOW-based contract claim, as well.

In either event, in support of its position that the court should enforce the clause, Revelex points to a number of cases in which Florida courts have enforced some pretty broad exculpatory clauses without suggesting that they rendered illusory or otherwise invalidated (or even undermined) the contracts in which they appeared.  *See* Br. of Appellant at 16–17 (citing, *e.g.*, *L. Luria & Son, Inc. v. Honeywell, Inc.*, 460 So. 2d 521, 522 (Fla. 4th Dist. Ct. App. 1984), *Ace Formal Wear v. Baker Protective Serv.*, 416 So. 2d 8, 9 (Fla. 3d Dist. Ct. App. 1982), and *Windstar Club, Inc. v. WS Realty, Inc.*, 886 So. 2d 986, 986–87 (Fla. 2d Dist. Ct. App. 2004)).  In *Ace Formal Wear*, for instance, a business brought breach-of-

---

[5] Revelex has conceded that the exculpatory clause doesn't cover intentional torts, but Pier 1 long ago dropped its fraudulent-misrepresentation claim, so that issue doesn't arise.

contract and negligence claims against the company that had installed its alarm

system.  After the system had been installed, burglars entered the customer's store

through a window that hadn't been wired "even though the wiring of that window

was required by the [installation] contract."  416 So. 2d at 9.  In rejecting the

customer's claims against the installer, the court pointed to and applied the

following exculpatory clause, which was contained in the installation agreement:

> Subscriber agrees that [the installer] shall not be liable for any of
> Subscriber's losses or damages, irrespective of origin, to person or to
> property, whether directly or indirectly caused by performance or
> nonperformance of obligations imposed by this contract or by
> negligent acts or omissions of [the installer], its agents or employees.
> The Subscriber does hereby waive and release any rights of recovery
> against [the installer] that it may have hereunder.

*Id*.  In a short opinion, the court enforced the clause, observing that "[t]he parties

were at liberty to contract as they pleased."  *Id*.

We make two brief observations, without in any way meaning to prejudge

matters.  First, the decisions that Revelex cites don't formally control here, if only

because, so far as we can tell, the illusoriness issue that Pier 1 raises—and to which

we'll turn next—wasn't presented, addressed, or decided in any of them.  Second,

there is a certain oddity (and perhaps inequity) in Revelex's position, in that it

permits a contracting party simultaneously (1) to promise to perform some

24

particular duty and (2) to immunize itself from any failure to perform that very duty.[6]  Which leads us to Pier 1's (and the district court's) position.

**b**

Pier 1 argues, and the district court held, that the Service Agreement's exculpatory clause was so broad—again, insulating Revelex from liability for "any … damages regardless of kind or type … whether in contract, tort (including negligence), or otherwise"—that it had the effect of rendering the entire contract illusory, and thus void *ab initio*.

It seems to us that there is likewise support in Florida law for this view. Under the law of Florida, there are several "basic requirements" of a valid contract: "offer, acceptance, consideration[,] and sufficient specification of essential terms." *St. Joe Corp. v. McIver*, 875 So. 2d 375, 381 (Fla. 2004).  Consideration, Florida courts have held, is "the primary element moving the execution of a contract," *Frissell v. Nichols*, 114 So. 431, 434 (Fla. 1927), and "absolutely necessary to the forming of a good contract," *Jones v. McCallum*, 21 Fla. 392, 392 (Fla. 1885).  Put simply, absent consideration there is no contract—never was.  Rather, "[t]he law aptly terms an agreement to do an act or to pay money or other thing where there is no consideration for it a *nudum pactum*—a naked agreement—a promise without

---

[6] The oddity is magnified if (as explained above) the exculpatory clause is read to reach beyond the Service Agreement and negate contract-based claims arising under other agreements, including the SOW.  *See supra* at 23.

25

legal support, which the law will not enforce, no matter whether verbal or written, or however earnestly and solemnly made." *Jones*, 21 Fla. at 395.

It seems equally well-settled that "[w]here an illusory promise is made, that is, a promise merely in form, but in actuality not promising anything, it cannot serve as consideration." 3 Williston on Contracts § 7:7 (4th ed. 2010). So, when is a contract illusory under Florida law, and thus incapable of supplying the necessary consideration? When "one of the promises appears on its face to be so insubstantial as to impose no obligation at all on the promisor—who says, in effect, 'I will if I want to.'" *Princeton Homes, Inc. v. Virone*, 612 F.3d 1324, 1331 (11th Cir. 2010) (quoting *Johnson Enters. of Jacksonville, Inc. v. FPL Grp., Inc.*, 162 F.3d 1290, 1311 (11th Cir. 1998)). Put slightly differently, "[w]here one party retains to itself the option of fulfilling or declining to fulfill its obligations under the contract, there is no valid contract and neither side may be bound." *Pan-Am Tobacco Corp. v. Dep't of Corr.*, 471 So. 2d 4, 6 (Fla. 1984). In particular—and closer to home here—Florida courts have held that "to prevent the contract from being illusory," the non-breaching party must have both "[t]he ability to sue for damages" and "the ability to collect on the resulting judgment." *Fla. Dep't of Envtl. Prot. v. ContractPoint Fla. Parks, LLC*, 986 So. 2d 1260, 1270 (Fla. 2008). The reasoning seems to be that absent a viable threat of liability, a contracting

party could "breach with impunity." *Port Largo Club, Inc. v. Warren*, 476 So. 2d 1330, 1333 (Fla. 3d Dist. Ct. App. 1985).

The district court's conclusion—following Pier 1's lead—was that by insulating Revelex from "any … damages regardless of kind or type … whether in contract, tort (including negligence), or otherwise," the exculpatory clause here denied Pier 1 "[t]he ability to sue for damages" and "collect on [any] resulting judgment," *ContractPoint*, 986 So. 2d at 1270, and thereby rendered the Service Agreement illusory. That conclusion left Pier 1's negligent-misrepresentation claim intact—because the exculpatory clause couldn't be enforced to bar it—but wiped out its breach-of-contract claim—there being no valid contract on which to sue.

That result, we think, suggests that there is a certain oddity inherent in this position, as well. In district court's (and perhaps more strangely, Pier 1's) view, the beneficiary of a sweeping exculpatory clause like the one at issue here would seem—at least with respect to breach-of-contract claims—to be in a "heads I win, tails you lose" situation. Either (1) the court enforces the clause, thereby immunizing the beneficiary from liability on the contract, or (2) the court invalidates the entire contract, thereby … you guessed it, immunizing the beneficiary from liability on the contract. Weird. (Here, of course, the inequity of that result is masked by the fact that Pier 1 brought a negligent-misrepresentation

27

claim that survived that Service Agreement's invalidation, but that won't always or necessarily be the case.)

**c**

There is a third option, suggested by the decisions in *Ivey Plants Inc. v. FMC Corp.*, 282 So. 2d 205 (Fla. 4th Dist. Ct. App. 1973), and *Sniffen v. Century National Bank of Broward*, 375 So. 2d 892 (Fla. 4th Dist. Ct. App. 1979).  In each case, the court addressed the effect of an exculpatory clause in a lease agreement on a claim-by-claim basis, concluding that it barred a party's negligence-based claim *but not* his breach-of-contract claim.  In *Ivey Plants*, the court observed that "[a] determination of the applicability of [an exculpatory clause] requires an analysis of its language in relation to the [s]ubject matter of the lease as well as the [d]ifferent causes of action" in the case, and held that "[t]he function of the exculpatory clause [at issue there was] to deprive one of the contracting parties of his right to recover damages suffered due to the negligent act of the other" but that the clause "d[id] not operate to exculpate or exonerate [the] defendant from performing under the terms of the lease agreement."  282 So. 2d at 207–08.  So too, in *Sniffen*, the court left open the possibility that a broad exculpatory clause could "preclude recovery for [the defendant's] negligence," but held that the clause "c[ould not] be employed … to negate the specific contractual undertaking …."  375 So. 2d at 893 & n.2.  Exonerating the defendant from contractual liability, the

28

court emphasized, "would render the agreement between the parties entirely nugatory" in that the plaintiff would "have received nothing whatever in return for his rental fee." *Id*. at 893–94.

What would be the effect of following *Ivey Plants* and *Sniffen* here? Seemingly, just the opposite of (as just discussed) invalidating the entire Service Agreement as illusory: Pier 1 would lose its negligent-misrepresentation claim to the exculpatory clause, but would retain its breach-of-contract claim. *Ivey Plants* and *Sniffen* seem to make good equitable sense—but they are not quite on point, and the distinction between those cases and this one arguably calls for a different result. Recall that *Ivey Plants* (whose analysis *Sniffen* followed) repeatedly emphasized the "language" of the particular "provisions" of the exculpatory clause there at issue, concluding that it was "not applicable" to the plaintiff's breach-of-contract claim. 282 So. 2d at 207–10. And that was true; the clause at issue there was broadly written, but it did *not* explicitly address breach-of-contract claims. *See id*. at 207. (The same was true of the clause at issue in *Sniffen*. *See* 375 So. 2d at 893.) Here, the exculpatory clause's "language" is not only broad but also specific; it forecloses all liability, for "any … damages" of any "kind or type"— expressly including those sounding in "contract." Accordingly, whereas the *Ivey Plants* and *Sniffen* courts had the luxury of being able to interpret their clauses' terms in a manner that preserved breach-of-contract liability and thus avoided

29

illusoriness, a court interpreting the Service Agreement's exculpatory clause—and the contracting parties' intent underlying it—arguably doesn't have the same freedom.

\* \* \*

Having framed and briefly explored the issue as we see it, we certify the following (admittedly compound) question to the Florida Supreme Court:

> Is a contractual "exculpatory clause" that purports to insulate one of the signatories from "any … damages regardless of kind or type … whether in contract, tort (including negligence), or otherwise" enforceable? Or, alternatively, does the clause confer such sweeping immunity that it renders the entire contract in which it appears illusory? Or, finally, might the clause plausibly be construed so as to bar some but not all claims and thus save the contract from invalidation?[7]

We are satisfied that the question meets the requirements of Fla. R. App. P. 9.150(a). *See also* Fla. Const. art. V, § 3(6); Fla. Stat. § 25.031. First, it is a "question[] of law," Rule 9.150(a), whose answer depends on the discernment and application of Florida contract principles. Second, the question is "determinative of the cause." *Id*. For reasons already explained, depending on how the question is resolved, Pier 1 will be left either (1) with a breach-of-contract claim but no negligent-misrepresentation claim, or (2) with a negligent-misrepresentation claim

---

[7] As is always the case when we certify questions, our phrasing is not intended to restrict, in any way, the Florida Supreme Court's consideration or resolution of the issue. *See, e.g.*, *Altman Contractors, Inc. v. Crum & Forster Specialty Ins. Co.*, 832 F.3d 1318, 1326 (11th Cir. 2016).

but no breach-of-contract claim, or (3) with neither claim.  Finally, "there is no controlling precedent of the Supreme Court of Florida."  *Id.*  As we've said, Florida law arguably supports any of three different answers to the question, but none of the decisions that have been cited to us (or that we have found ourselves) is quite on point.

We are also satisfied that the question meets our own standard for certifying questions of state law.  There is, we think, clearly "doubt in the interpretation of [Florida] law" here, such that we may—and we believe should—"certify [a] question to the state supreme court [so that we] avoid making unnecessary *Erie* guesses and … offer the state court the opportunity to interpret or change existing law."  *Union Planters Bank, N.A. v. New York*, 436 F.3d 1305, 1306 (11th Cir. 2006) (citation omitted).

Finally, we are confident that a proper respect for the principles of federalism counsels certification here.  By virtue of the diversity jurisdiction conferred on federal courts under 28 U.S.C. § 1332, we are empowered to answer questions of Florida law.  But doing so is hardly our specialty, whereas it *is* the Florida Supreme Court's.  Any resolution that we could provide regarding the question(s) that we have identified wouldn't bind the Florida courts, who would be free (as they should be) to come to their own conclusions.  The Florida Supreme Court, by contrast, is the ultimate arbiter of Florida law; both we and the lower

31

state courts are bound by its determinations of state law. *See, e.g.*, *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975). Particularly where, as here, we are faced with a common-law question that is, at once, so knotty and weighty, we see no sound reason not to facilitate the Florida Supreme Court's consideration and resolution of it. *Cf. Trail Builders Supply Co. v. Reagan*, 409 F.2d 1059, 1060–61 (5th Cir. 1969) ("As an *Erie*-bound Court, we are obliged to follow the Florida appellate decisions in diversity matters, and if there are no decisions on point, we may make an educated guess as to what the Florida courts would decide…. However, there is available to us the right to submit by certification the … issues raised by this case.").[8]

### III

For the foregoing reasons, we hold as follows:

1.      We affirm the district court's decision that the Scope of Work exists independently of the Service Agreement on the ground that Revelex has waived any argument to the contrary (or, alternatively, invited any alleged error or is judicially estopped from now contesting the district court's determination).

---

[8] *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (holding that decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981, are binding in the Eleventh Circuit).

2.    We likewise affirm the district court's decision that Pier 1's lost-profits claim fails as a matter of law and that Revelex is entitled to judgment as a matter of law on that claim.

3.    We hold that Pier 1 is not entitled to recover attorneys' fees.

4.    We certify to the Florida Supreme Court the following question, in whatever form that court chooses to address it:

> Is a contractual "exculpatory clause" that purports to insulate one of the signatories from "any … damages regardless of kind or type … whether in contract, tort (including negligence), or otherwise" enforceable?  Or, alternatively, does the clause confer such sweeping immunity that it renders the entire contract in which it appears illusory?  Or, finally, might the clause plausibly be construed so as to bar some but not all claims and thus save the contract from invalidation?

**AFFIRMED IN PART, and QUESTION CERTIFIED.**