[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-13539

_____

PHILIPPE CALDERON,
ANCIZAR MARIN,
on behalf of themselves and all others
similarly situated,

Plaintiffs-Appellants,

KELLI BOREL RIEDMILLER,

Interested Party-Appellant,

AMIR CHARNIS,

Plaintiff,

*versus*

SIXT RENT A CAR, LLC,

2                    Opinion of the Court                    22-13539

                                                  Defendant-Appellee,

SIXT FRANCHISE USA, LLC,

                                                        Defendant.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 0:19-cv-62408-AHS

_____

Before WILLIAM PRYOR, Chief Judge, and JILL PRYOR and MARCUS,
Circuit Judges.

MARCUS, Circuit Judge:

This putative class action comes before us following the entry of final summary judgment for the defendant, Sixt Rent a Car, LLC ("Sixt"). Plaintiffs in three different states (Philippe Calderon in Florida, Ancizar Marin in Arizona, and Kelli Borel[1] in Colorado) each rented a vehicle from Sixt. After each plaintiff returned their vehicle, Sixt sent each of them a series of collection letters and

---

[1]    Since the filing of this lawsuit, Borel got married and changed her name to Kelli Borel Reidmiller.  We adopt the convention of the parties and refer to Borel Reidmiller solely as "Borel."

invoices seeking payment for damages to the vehicles that allegedly occurred during each respective rental period.

Plaintiffs brought their claims against Sixt in the United States District Court for the Southern District of Florida for common law breach of contract, alleging that the invoices were in violation of Sixt's Terms & Conditions (the "T&C"). Plaintiffs also sued Sixt under the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201 *et seq.* ("FDUTPA").

The district court granted summary judgment for Sixt on all claims. First, the district court found that the T&C were not part of the Rental Agreement and, therefore, there could be no breach of contract. Second, the district court concluded that no reasonable jury could find that any of the Plaintiffs suffered actual "out-of-pocket" damages, and therefore determined that the Plaintiffs could not prove that element of a FDUTPA claim. The district court correctly determined that Plaintiffs suffered no actual damages. However, the district court erred as to the breach of contract claims. Under the respective state laws of Florida, Arizona, and Colorado, the T&C were properly incorporated into the rental contracts by reference.

We therefore reverse the judgment of the district court in part as to the breach of contract claims, affirm in part on the FDUTPA claims, and remand for further proceedings consistent with this opinion.

## I.
### A.

Calderon, Marin, and Borel are representatives of a putative class action against Sixt, a German car rental company whose North American headquarters and claims department are located in Fort Lauderdale, Florida. In essence, Plaintiffs allege that "Sixt has organized a company-wide scheme to profit by systemically charging unfair, deceptive, and unauthorized Estimated Repair Costs and other sham fees not permitted by the Rental Agreement" signed by Sixt's customers.

The Rental Agreement is comprised of two documents. The first document is the Face Page, which provides the terms that are specific to a customer's rental, such as the vehicle being rented, the daily rate, the number of days in the rental period, restrictions on where the vehicle can be taken, and so forth. When printed, the Face Page looks something like a large receipt, with the customer's signature at the bottom.

The second part of the Rental Agreement is the T&C. The T&C contain all the commercial, legal, and financial terms that are generally applicable to Sixt rentals. Most often, the T&C appear in the form of an eight-page preprinted booklet called the "Rental Jacket." The Rental Jacket is bright orange and bears the words "Ready to rent. Terms and Conditions Rental Jacket" in large letters on the front cover. Among other things, the T&C establish that the customer is "responsible for the safety of and damage to or loss of the Vehicle" during the rental period. The T&C specifically state that the customer is "responsible for the cost of repair, or the

actual cash retail value of the Vehicle on the date of the loss if the Vehicle is not repairable or if [Sixt] elect[s] not to repair the Vehicle." The customer is also responsible for "Loss of Use," "Diminished Value," and any "administrative expenses incurred processing a claim."

Although the customer's signature appears at the bottom of the Face Page, the customer does not sign the T&C. However, the Face Page says above the signature line that:

> By signing below, you agree to the Terms and Conditions printed on the rental jacket and to the terms found on this Face Page, which together constitute this Agreement. You acknowledge that you have been given an opportunity to read this Agreement before being asked to sign it, and that all information you have provided is true and correct.

Similarly, the first page of the Rental Jacket states that the "Agreement" encompasses "the Terms and Conditions on this page and the provisions found on the Face Page."

Typically, as the parties agree, the standard practice for renting a vehicle from Sixt involves a customer arriving at the rental counter, where he is greeted by a Sixt agent. The agent asks for the customer's name, driver's license, and reservation (if any), and enters that information into Sixt's computer system. The customer then selects his vehicle options (if he has not already done so through a reservation), the price is disclosed to the customer, and the customer inserts a credit card into a credit card reader and

confirms the amount. After the credit card information is processed, the agent prints a paper copy of the Face Page. The agent then places the Face Page and the Rental Jacket containing the T&C on the counter for the customer to review. The customer then signs his name on an electronic signature pad. The signature pad is a black box that displays only a blank space where the customer can put his signature; it does not display any text from the Rental Agreement. When the customer signs the signature pad, he is signing a digital copy of the Face Page stored on the Sixt computer. After the customer signs, the agent hands the customer the keys to the vehicle along with paper copies of the Face Page and the Rental Jacket containing the T&C.

At all times relevant to this case, it has been Sixt's practice to have copies of the T&C Rental Jacket available for each customer's review at the rental kiosk, as well as to provide each customer with a copy of the T&C Rental Jacket before he leaves the rental kiosk. Additionally, the T&C were always available online on the Sixt website, to be viewed or downloaded by customers at will.

**B.**

On March 23, 2016, Phillipe Calderon made an online reservation through Sixt's website for an April 1, 2016 car rental in Miami, Florida. In making the reservation online, Calderon selected the dates (April 1 to April 4), rate of his rental ($124.59 in total), a specific vehicle (a Mercedes-Benz passenger van), add-on insurance, and specified a second driver for the vehicle (his daughter, Sue Ellen Calderon). To book the rental, Calderon was also

required to click a checkbox acknowledging and accepting the T&C, which were presented to him on the website via a hyperlink. However, the version of the T&C that Calderon agreed to on the website in March 2016 was not the same as the version of the T&C that was in circulation in April 2016.

Calderon testified in a deposition that, on the day of the rental:

> I walked up to [the rental agent] and I said, "I'm Mr. Phil Calderon. I have a reservation." She look[ed] it up, and she said, "Oh, yeah, it's fine. I'm ready." And she told me sign. She asked me for my ID and my credit card. I gave it to her; she look[ed] at it. She did what she ha[d] to do, and then she [gave] it back to me with all the papers, like, in a packet, and the keys and she walk[ed] out with me to the car.

Calderon described the "packet" as a "normal rental car packet that they give you with all the papers." Calderon stated that he "guess[ed]" that there was a copy of the rental agreement inside the packet, but he did not specifically recall. He testified that he received the packet of paperwork after he had already signed the electronic signature pad, and that at no point did the agent show him any documents or walk him through the terms of the Rental Agreement before he signed. However, Sue Ellen Calderon, who accompanied him at the rental car pick up, testified that the rental agent placed a packet containing the Rental Agreement on the counter in front of them when she and her father walked in.

After the rental was returned, Sixt billed Calderon in the amount of $631.65 for damage to the rental car. In a letter, Sixt explained that it was "claim[ing] damage compensation from [Calderon] as per the rental contract [he] agreed to." Calderon never paid any of the charges invoiced by Sixt, and Sixt later canceled its claim against Calderon and deleted all charges from his account.

## C.

In February 2019, Ancizar Marin used a third-party website -- orbitz.com -- to reserve a Sixt rental car in Phoenix, Arizona. To make the reservation, Marin selected his car type (a Mercedes-Benz CLA or similar), the dates of the rental (March 5 to March 8), and the rental rate ($241.64 total).

Marin picked up the vehicle on the day of the rental at a Sixt kiosk. Marin testified in a deposition that he could not recall whether there were any papers or brochures at the kiosk. Marin said that the Sixt rental agent asked for his ID and credit card, processed the reservation on a computer behind the counter, and then asked him to sign an electronic black box. Marin testified that he had "no idea" what he was signing and that it was "never explained." Marin also said that he did not think he was handed any paperwork before he went to get the vehicle. Marin unequivocally stated that he did not receive the Rental Jacket with the T&C at any point during his rental.

Later that month, Marin was notified of damage to his vehicle by email and was asked to fill out an online damage report. Sixt then emailed Marin an invoice in the amount of $708.62 for repair

costs, loss of use, and administrative fees, asserting Sixt's "right to claim damage compensation . . . as per the rental contract [Marin] agreed to." Ultimately, Marin's insurer, Allstate, paid the repair costs, and Marin paid the administrative and loss of use fees with his business credit card.

**D.**

In May 2019, Kelli Borel used a third-party website -- hotwire.com --  to reserve a Sixt Rental Car in Denver, Colorado from June 10 through June 14, 2019. Borel prepaid for her reservation online through the website. After Borel's booking through the third-party website was complete, she was informed that the car rental was from Sixt.

Borel picked up a car from Sixt at a site near the Denver Airport. Borel testified in a deposition that she could not specifically remember the details of this reservation pick-up because she frequently rented cars, but that typically she would hand the rental agent her identification and credit card, and the rental agent would pull up the reservation and confirm the details of any dates or insurance add-ons. Borel did not specifically recall signing anything, but her signature appears at the bottom of the Face Page. Borel didn't recall whether she was shown any paperwork prior to receiving her keys, but specifically stated that she did not see the orange Rental Jacket until the agent handed the packet to her with the car keys. Borel testified that she did not read through the paperwork when it was handed to her.

After she returned the rental, Borel received an email from Sixt indicating that damage had been found on the returned vehicle. Sixt later sent Borel an invoice for the damage in the amount of $523.75. Ultimately, the invoice was paid by Borel's employer.

### E.

In September 2019, Calderon and Marin filed a putative class action complaint against Sixt in the Southern District of Florida. In March 2022, Calderon, Marin, and Borel filed the operative Second Amended Complaint, alleging three causes of action. Count One is a breach of contract claim essentially asserting that Sixt breached the T&C by charging fees that were not authorized by the T&C or were not calculated in a manner consistent with the T&C. Counts Two and Three allege statutory claims arising under Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq*.

Sixt moved for summary judgment on all claims. The district court granted Sixt's motion for summary judgment against all three representative Plaintiffs prior to addressing any questions concerning class certification. This timely appeal followed.

### II.

"We review the district court's grant of summary judgment *de novo*, viewing all evidence and drawing all reasonable factual inferences in favor of the nonmoving party." *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012) (citing *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc)). "Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of

law." *Id.* "It is not the court's role to weigh conflicting evidence or to make credibility determinations; the non-movant's evidence is to be accepted for purposes of summary judgment." *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).

"[T]his, however, does not mean that we are constrained to accept all the nonmovant's factual characterizations and legal arguments." *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 458–59 (11th Cir. 1994). "[T]he nonmoving party must offer more than a mere scintilla of evidence for its position; indeed, the nonmoving party must make a showing sufficient to permit the jury to reasonably find on its behalf." *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1050 (11th Cir. 2015).

### III.

### A.

We begin with the Plaintiffs' breach of contract claims. This action is before our Court as a diversity-based class action arising under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2)(A). When sitting in diversity jurisdiction, we are, of course, *Erie*-bound to apply the substantive law of the forum state -- including on conflict-of-laws issues. *See, e.g.*, *Pier 1 Cruise Experts v. Revelex Corp.*, 929 F.3d 1334, 1349 (11th Cir. 2019). Here, the forum state is Florida.

"When resolving conflict-of-laws issues in contract actions, the Florida Supreme Court has unambiguously" adopted the "traditional rule of *lex loci contractus*." *Fioretti v. Mass. Gen. Life Ins. Co.*, 53 F.3d 1228, 1235 (11th Cir. 1995) (citing *Goodman v. Olsen*, 305 So. 2d 753, 755 (Fla. 1974)). "The doctrine of *lex loci contractus* directs

that, in the absence of a contractual provision specifying the governing law, a contract . . . is governed by the law of the state in which the contract is made . . . ." *Id.* (footnote omitted). Calderon, Marin, and Borel rented their vehicles in Florida, Arizona, and Colorado, respectively. All of the parties therefore agree that the breach of contract claims for each of the Plaintiffs are evaluated under the law of the state in which each Plaintiff rented his or her vehicle -- again, Florida, Arizona, and Colorado, respectively.

The basic elements of a breach of contract claim are essentially the same in all three states: "(1) a valid contract; (2) a material breach; and (3) damages." *Friedman v. N.Y. Life Ins. Co.*, 985 So. 2d 56, 58 (Fla. 4th DCA 2008); *see also Thomas v. Montelucia Villas, LLC*, 302 P.3d 617, 621 (Ariz. 2013) (same); *W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992) (including an additional element of "performance by the plaintiff or some justification for nonperformance").

It is only the first element -- whether there is a valid contract -- that is at issue in this case. To create a legally binding agreement, Florida, Arizona, and Colorado each require, among other things, "sufficient specification of essential terms." *St. Joe Corp. v. McIver*, 875 So. 2d 375, 381 (Fla. 2004); *see also Savoca Masonry Co. v. Homes & Son Const. Co.*, 542 P.2d 817, 819 (Ariz. 1975) (same); *I.M.A., Inc. v. Rocky Mountain Airways, Inc.*, 713 P.2d 882, 888 (Colo. 1986) (same). Each state also requires that the parties mutually agree upon those essential terms. *David v. Richman*, 568 So. 2d 922, 924

(Fla. 1990); *Hill-Shafer P'ship v. Chilson Fam. Tr.*, 799 P.2d 810, 814 (Ariz. 1990); *I.M.A., Inc.*, 714 P.2d at 888 (Colorado).

Sixt argues that, because each of the Plaintiffs used the electronic signature pad to sign the Face Page without receiving a copy of the T&C, "the T&C provisions concerning the Fees were not incorporated by reference into their agreements, [and] it follows that Sixt cannot have breached those provisions and summary judgment was properly granted in Sixt's favor on Plaintiffs' contract claims."

The sole question on the breach of contract claims, then, is whether, even if we assume that none of the Plaintiffs received a copy of the T&C before signing the Face Page, the T&C were nevertheless incorporated by reference into the contract signed by each of the Plaintiffs under the laws of their respective states. For the reasons we explain in some detail, the T&C were incorporated by reference into each contract under the law of each state, and, therefore, the district court erred in granting summary judgment.

## B.

Calderon rented his car in Florida. The district court found -- and Sixt argues -- that "[t]he undisputed factual record reveals there is no evidence Calderon received or was shown the Terms and Conditions before signing" and that "there is no other record evidence that could support the inference Calderon received the Terms and Conditions." Therefore, the district court held, Calderon cannot have been put on notice of the T&C, and they were not incorporated. We observe at the outset, however, that although

Calderon did testify that he did not see the T&C Rental Jacket prior to signing, this is a disputed fact because there are two important pieces of evidence to the contrary.

First, Sue Ellen Calderon testified that when she and her father arrived at the Sixt kiosk, the rental agent placed a packet containing the Rental Agreement -- that is, the Face Page and the Rental Jacket -- on the counter in front of them. Sue Ellen Calderon's testimony was that she and her father received the packet containing the Rental Agreement before Calderon signed the signature pad.

Second, Sue Ellen Calderon's testimony is consistent with Sixt's admitted standard practice. There is no dispute that Sixt's practice and custom is for the rental agent to enter the customer's information into Sixt's computer system, disclose the price to the customer, and then to print a paper copy of the Face Page and place it along with the T&C Rental Jacket on the counter for the customer to review. Only then does the customer sign his name on the Face Page using the electronic signature pad.

At the summary judgment stage, the court must view all evidence in the light most favorable to the non-moving party. *See Strickland*, 692 F.3d at 1154. Here, Calderon is the non-moving party, and -- in the face of Sue Ellen Calderon's testimony and Sixt's own standard practice -- the district court clearly erred in finding that "there is no other record evidence that could support the inference Calderon received the Terms and Conditions." A reasonable jury could find that Calderon was, in fact, handed a copy of the

T&C before he signed. *See LoanFlight Lending, LLC v. Bankrate, LLC*, 378 So. 3d 1280, 1288 (Fla. 2d DCA 2024) (noting that factual questions about whether the parties entered into a contract at all are "antecedent" and must be determined by the factfinder).

But the question of whether Calderon received a copy of the Rental Jacket including the T&C before signing the Rental Agreement need not be sent to a jury. Even if it were beyond dispute that Calderon had not seen the T&C before signing -- which it is not -- Florida law is clear that he is bound by the T&C anyway because he signed the Face Page and the Face Page validly incorporates the T&C.

Under Florida law, "where a writing expressly refers to and sufficiently describes another document, that other document, or so much of it as is referred to, is to be interpreted as part of the writing." *OBS Co. v. Pace Constr. Corp.*, 558 So. 2d 404, 406 (Fla. 1990). Specifically, Florida law provides that:

> To incorporate by reference a collateral document, the incorporating document must (1) specifically provide "that it is subject to the incorporated [collateral] document" and (2) the collateral document to be incorporated must be "sufficiently described or referred to in the incorporating agreement" so that the intent of the parties may be ascertained.

*BGT Grp., Inc. v. Tradewinds Engine Servs., LLC*, 62 So. 3d 1192, 1194 (Fla. 4th DCA 2011) (alteration in original) (quoting *Kantner v. Boutin*, 624 So. 2d 779, 781 (Fla. 4th DCA 1993)); *see also Hurwitz v.*

*C.G.J. Corp.*, 168 So. 2d 84, 87 (Fla. 3d DCA 1964).  The key issue for incorporation in Florida, in other words, is whether "the contract and related documents *evidence an intent* to be bound" to the terms of the collateral document.  *Kaye v. Macari Bldg. & Design, Inc.*, 967 So. 2d 1112, 1114 (Fla. 4th DCA 2007) (emphasis added). In Florida, the question of whether a contract validly incorporates another document is a question of law, and we consider it *de novo*. *Avatar Props., Inc. v. Greetham*, 27 So. 3d 764, 766 (Fla. 2d DCA 2010).

Here, the first element of incorporation by reference is satisfied.  The Face Page signed by Calderon explicitly states that:

> By signing below, you agree to the Terms and Conditions printed on the rental jacket and to the terms found on this Face Page, which together constitute this Agreement.  You acknowledge that you have been given an opportunity to read this Agreement before being asked to sign it . . . .

Therefore, the Face Page specifically provides that it is subject to the incorporated collateral T&C.  *See BGT Grp., Inc.*, 62 So. 3d at 1194.

The essential question, then, is whether the T&C were "sufficiently described or referred to in the incorporating agreement" so that we may ascertain the intent of the parties.  *Id.* (quoting *Kantner*, 624 So. 2d at 781).  Here, the T&C were specifically described as "the Terms and Conditions printed on the rental jacket."  This is a specific description that the T&C are physically printed on a separate document -- namely, the Rental Jacket, which is itself bright

orange in color, and says "Terms and Conditions Rental Jacket" in large block letters on the cover. This is "more than a 'mere reference'" to the possible existence of a separate collateral document. *Kaye*, 967 So. 2d at 1114. Although Calderon testified that he was not given a copy of the T&C before he signed, there is no dispute that a copy of the Rental Jacket was available for his review at the counter (and, indeed, he was handed a copy of the Rental Jacket, at the latest, moments after he signed). Furthermore, Calderon had already been required to assent to the T&C, which had been provided to him via hyperlink when he made his booking on Sixt.com. *See Massage Envy Franchising, LLC v. Doe*, 339 So. 3d 481, 485 (Fla. 5th DCA 2022) (holding that a hyperlink provided "sufficient notice of [the] terms and conditions"). Although it is true that the T&C that Calderon assented to online were out of date by the time he picked up his car, Calderon was placed on notice that the T&C were readily available online. Finally, the specific clause on the Face Page requiring the signer to "acknowledge that you have been given an opportunity to read this Agreement" (which expressly includes both the Face Page and the T&C by the terms of the Face Page itself) and that the signer "agree[s] to the Terms and Conditions" together "unambiguously indicate the parties' intention to be bound" by both the Face Page and the T&C. *Kaye*, 967 So. 2d at 1114.

Sixt, nevertheless, relies upon *Spicer v. Tenet Florida Physician Services, LLC*, 149 So. 3d 163 (Fla. 4th DCA 2014), to argue that because the Face Page did not explicitly tell Calderon where to find the T&C, it was not sufficiently described. But *Spicer* is readily

distinguishable from this case.  In *Spicer*, the contract at issue stated only that "any and all disputes regarding your employment with [Tenet] . . . are subject to the Tenet Fair Treatment Process ['FTP']."  *Id.* at 164.  But the location of the FTP was not only undisclosed to the employee, it was difficult to locate: the FTP was not a document in and of itself, but rather was "a subpart of the Open Door and Fair Treatment Policy, which was not mentioned or described within the employment agreement."  *Id.* at 167.

In holding that the FTP was not incorporated for lack of specificity, Florida's Fourth District Court of Appeal in *Spicer* drew a comparison to *Kaye v. Macari Building & Design, Inc.*, 967 So. 2d 1112 (Fla. 4th DCA 2007).  In *Kaye*, the Fourth District Court of Appeal reversed the circuit court and held that a non–contemporaneously provided document -- "The American Institute of Architects Documents No. A-201, April 1997 Edition" -- had been incorporated into a contract.  *Id.* at 1113.  Unlike the FTP in *Spicer*, the "citation to a specific document" in *Kaye* gave more information about the incorporated document than just a vague reference to it.  *Spicer*, 149 So. 3d at 167.  The appellate court in *Spicer* further distinguished its holding from *Kaye* on the ground that the document in *Kaye* was identifiable in and of itself, whereas the referenced collateral document in *Spicer* was not even a document itself, but merely a subpart of a third document not even mentioned in the incorporating document.  *Id.*

This case strikes us as more like *Kaye* than *Spicer*.  The Face Page describes the T&C as "printed on the rental jacket," the

Rental Jacket was an easily identifiable standalone document, and the Face Page required Calderon to affirm that he had been given an opportunity to view the T&C before he agreed to it. Moreover, Calderon had already been provided a copy of the T&C (albeit an outdated one) online.

Sixt also says that this case is like the Florida Fourth District Court of Appeal's decision in *BGT Group, Inc. v. Tradewinds Engine Services, LLC*, 62 So. 3d 1192 (Fla. 4th DCA 2011). But this analog is equally misplaced. In *BGT Group*, a sales quote included, under a section labeled "remarks," a note that the quote was "subject to the *attached* BGT terms and conditions." *Id.* at 1193 (formatting altered) (emphasis added). However, no terms or conditions were in fact attached to the quote. *Id.* at 1194. The purchaser later testified that he did not request a copy of the terms and conditions because "the reference to it in the quote was to 'something that didn't exist.'" *Id.* at 1193–94. The court in *BGT Group* held that the terms and conditions were not incorporated because "[a] reasonable view of this 'contract' is that BGT, as the drafter of the documents, did not intend to incorporate any 'terms and conditions' where it did not provide a specific description of them or attach them to the quote and purchase order." *Id.* at 1195. In sharp contrast, the T&C in this case were provided to Calderon beforehand via hyperlink on the website, they were not described as "attached" when no document was in fact attached, but rather described as "printed on the rental jacket," and there is no reasonable doubt that Sixt intended to incorporate the terms and conditions. *Id.*

Finally, at oral argument, Sixt asserted for the first time that Calderon could not have assented to incorporation terms on the Face Page because he never saw a copy of the Face Page prior to signing the electronic signature pad. For one thing, Sixt's argument on this count has been abandoned. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 680–83 (11th Cir. 2014). "Any issue that an appellant wants [us] to address should be specifically and clearly identified in the brief." *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1330 (11th Cir. 2004). "If an argument is not fully briefed . . . to the Circuit Court, evaluating its merits would be improper both because the appellants may control the issues they raise on appeal, and because the appellee would have no opportunity to respond to it." *Id.* Arguments raised for the first time at oral argument plainly "come too late." *Sapuppo*, 739 F.3d at 683.

Furthermore, we think the argument fails on the merits anyway. "It has long been held in Florida that one is bound by his contract." *Allied Van Lines, Inc. v. Bratton*, 351 So. 2d 344, 347 (Fla. 1977). As the Supreme Court of Florida has explained:

> Unless one can show facts and circumstances to demonstrate that he was prevented from reading the contract, or that he was induced by statements of the other party to refrain from reading the contract, it is binding. No party to a written contract in this state can defend against its enforcement on the sole ground that he signed it without reading it.

*Id.* at 347–48. This rule holds true regardless of whether a party simply chooses not to read the agreement or is even physically

incapable of reading the agreement. *Rocky Creek Ret. Props., Inc. v. Est. of Fox ex rel. Bank of Am., N.A.*, 19 So. 3d 1105, 1108 (Fla. 2d DCA 2009); *see also Estate of Etting ex rel. Etting v. Regents Park at Aventura, Inc.*, 891 So. 2d 558, 558 (Fla. 3d DCA 2004) (per curiam) (holding that blind decedent was bound by signed contract in the absence of evidence that she was coerced into signing it or affirmatively prevented from knowing its contents); *Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. Benton*, 467 So. 2d 311, 312–13 (Fla. 5th DCA 1985) (holding that plaintiff was bound by signed contract despite her inability to read English).

Here, Calderon signed the Face Page using the electronic signature pad, and under the facts and circumstances of this case he is bound under Florida law by the terms of the Face Page -- including those terms incorporating the T&C -- even if he did not in fact see the Face Page before he signed. Calderon reserved the car online, knew the exact dates, the vehicle type, and the exact price, and when he approached the kiosk he was asked to sign on the line before he paid. If there was any ambiguity about what he was signing or what the ramifications of signing were, under Florida law, Calderon had the duty to inquire before he signed. *Rocky Creek Ret. Props.*, 19 So. 3d at 1109 ("'A party has a duty to learn and know the contents of an agreement before signing it,' and '[a]ny inquiries . . . concerning the ramifications of [the contract] should have been made before signing.'" (alterations in original) (quoting *Onderko v. Advanced Auto Ins., Inc.*, 477 So. 2d 1026, 1028 (Fla. 2d DCA 1985)); *see also Benton*, 467 So. 2d at 313 ("[F]ailure to obtain a reading and explanation of [a contract] is such gross negligence as will estop

[the signer] from avoiding it on the ground that he was ignorant of its contents." (citation omitted)).  The only way Sixt could argue that Calderon's signature on the Face Page was not binding under Florida law would be if Sixt alleged that its own agent coerced Calderon to sign or affirmatively prevented him from knowing what he was signing.  *See Rocky Creek Ret. Props.*, 19 So. 3d at 1108; *Etting*, 891 So. 2d at 558–59.  Sixt wisely makes no such argument.

The T&C were incorporated into Calderon's rental agreement.  The district court erred in granting summary judgment on Calderon's breach of contract claims.

## C.

Marin's vehicle was rented in Arizona.  Arizona's courts instruct us that the "[i]nterpretation of a contract presents a question of law."  *Weatherguard Roofing Co. v. D.R. Ward Const. Co.*, 152 P.3d 1227, 1229 n.4 (Ariz. Ct. App. 2007).  We therefore consider whether the T&C were incorporated by reference into Marin's contract *de novo*.  *Id.*

Under Arizona law, a document may be incorporated by reference into a contract if: (1) the reference is "clear and unequivocal," (2) the reference is "called to the attention of the other party," (3) the other party "consent[s] thereto," and (4) "the terms of the incorporated document must be known or easily available to the contracting parties."  *United Cal. Bank v. Prudential Ins. Co. of Am.*, 681 P.2d 390, 420 (Ariz. Ct. App. 1983) (emphasis omitted) (citation omitted).  Physical attachment of an incorporated document "is not necessary *if* the document to be incorporated is *clearly and*

*unambiguously* incorporated by reference." *Id.*; *see also Weatherguard Roofing*, 152 P.3d at 1230.  Moreover, where a party "gave its consent to the incorporation of [a collateral document] into the contract by reference," that party "is presumed to know its full purport and meaning, even though as a fact it did not." *Indust. Comm'n v. Ariz. Power Co.*, 295 P. 305, 307 (Ariz. 1931).

The Arizona standard for incorporating a document is a generous one.  In *Weatherguard Roofing Co. v. D.R. Ward Construction Co.*, 152 P.3d 1227 (Ariz. Ct. App. 2007), for example, the subcontract at issue contained a single clause which stated that "[t]he attached General Conditions are part of the subcontract." *Id.* at 1229. However, the authoring party of the subcontract failed to attach a copy of the General Conditions to the subcontract.  *Id.* at 1230. Nevertheless, the Court of Appeals of Arizona, Division One, held that "whether the general conditions were attached to the subcontract is irrelevant" because the clause in the subcontract meant that the signing party "was on notice of the general conditions, and their incorporation into the subcontract." *Id.*

The incorporation of the T&C in this case easily meets this standard.  First, the Face Page explicitly states that the T&C and the Face Page "together constitute th[e] Agreement."  Thus, the incorporation of the T&C into the agreement is "clear and unequivocal." *United Cal. Bank*, 681 P.2d at 420.  Second, the Face Page expressly required the signer to consent to the T&C in two separate clauses, and required the signer to acknowledge that he has "been given an opportunity to read th[e] Agreement," including

the T&C. The reference was called to Marin's attention within the Face Page and, by signing the Face Page, Marin expressly consented to the incorporation of the T&C. *See id.* Finally, as the parties agree, the T&C were at all times available online and it was Sixt's practice to have copies of the T&C at every rental kiosk available for the customer's review. Therefore, we find that the incorporated T&C were "easily available to the contracting parties." *Id.*

Sixt concedes that "[h]ad Marin been shown the Face Page or signed a paper copy of the Face Page that referenced the T&C, he arguably would have been on notice of the T&C and thus bound by its terms." However, Marin testified in a deposition that he was not shown a copy of the Face Page before he signed the electronic signature pad. Sixt argues that, because Marin did not read the Face Page itself, the fact that it referenced the T&C was never "called to Marin's attention" and therefore the Face Page could not have incorporated the T&C. Sixt's argument fails for two reasons.

First, the sole case cited by Sixt to support the proposition that an incorporated document must be called to the signer's attention outside of the signed contract itself is an unpublished District of Arizona case, *Cottonwood Centers Inc. v. Klearman*, No. CIV 18-252-TUC-CKJ, 2018 WL 5084657 (D. Ariz. Oct. 18, 2018). *See id.* at *6 (holding that terms and conditions emailed to contracting party along with contract that was eventually signed, and referenced as incorporated into the contract, were not incorporated because the body of the email itself did not call the terms and conditions to the attention of the contracting party). *Cottonwood Centers*, although

22-13539                Opinion of the Court                25

ostensibly applying Arizona law, relied primarily on a Ninth Circuit case which applied California state law. *See id.* at *5 (discussing *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171 (9th Cir. 2014)). And, on our read, *Cottonwood Centers* is directly in conflict with *Weatherguard Roofing*, where the Court of Appeals of Arizona, Division One, held that the simple statement in the contract that "[t]he attached General Conditions are part of the subcontract" was alone enough to incorporate the General Conditions by reference even when they were not, in fact, attached. *Weatherguard Roofing*, 152 P.3d at 1229–30. We are *Erie*-bound to follow *Weatherguard Roofing*. *See Winn-Dixie Stores, Inc. v. Dolgencorp, LLC*, 746 F.3d 1008, 1025 (11th Cir. 2014) ("Federal courts sitting in diversity are bound to adhere to decisions of [Arizona's] intermediate appellate courts, absent some persuasive indication that the state's highest court would decide the issue otherwise." (internal quotation marks and citation omitted)).

Second, Sixt's argument that Marin would have been on notice of the T&C but for the fact that he did not read the Face Page he was signing (or ask to read what he was signing with the electronic signature pad), runs afoul of a long-established rule in Arizona law that "one who signs a written document is bound to know and assent to its provisions in the absence of fraud, misrepresentation, or other wrongful acts by the other party." *Teran v. Citicorp Pers.-to-Pers. Fin. Ctr.*, 706 P.2d 382, 384 (Ariz. Ct. App. 1985). Here, there is no dispute that Marin's signature appears on the bottom of the Face Page. And absent any evidence of fraud -- which, not surprisingly, Sixt does not allege -- the fact that Marin

did not look at the Face Page or understand what he was signing is "not material unless [Sixt] undertook the responsibility to explain the documents to [Marin] and, either intentionally or negligently, failed to adequately perform that undertaking." *Id.* at 384–85. There is no suggestion that Sixt's employees undertook an attempt to explain the document to Marin and misled him, negligently or otherwise. To the contrary, Marin affirmatively denied that any explanation was given for what he was signing at all. Where Marin was simply asked to sign the electronic signature pad, and he did so without knowing what he was signing or the legal significance of it, he is not absolved of his failure to make a bare inquiry as to what he was signing and binding himself to. *See id.*; *cf. Condos v. United Benefit Life Ins. Co. of Omaha*, 379 P.2d 129, 131 (Ariz. 1963) ("It is generally held that, when a person is unable to read a document which he signs, it is his duty to have the same read to him, if there is a person available who can read it, and that, if he neglects to have this done, he may not thereafter be heard to say that he did not assent to its provisions." (quoting *Sovereign Camp of the Woodmen of the World v. Daniel*, 62 P.2d 1144, 1148 (Ariz. 1936))).

Marin was bound to the terms of the Face Page which clearly and unequivocally incorporated the T&C, unambiguously alerted Marin to the T&C's incorporation, and to which he consented by signing. Again, the T&C were readily available for his review. No more was required under Arizona law. The district court erred in granting summary judgment to Sixt on Marin's breach of contract claims.

## D.

Borel rented her car in Colorado.  In Colorado, "[t]he interpretation of a contract is a question of law" to be reviewed *de novo*. *Fed. Deposit Ins. Corp. v. Fisher*, 292 P.3d 934, 937 (Colo. 2013). "Whether contract terms have been incorporated by reference into a contract is also a question of law subject to de novo review." *French v. Centura Health Corp.*, 509 P.3d 443, 449 (Colo. 2022).  Under Colorado law, a collateral document may be incorporated only if it is "clear that the parties to the agreement had knowledge of and assented to the incorporated terms."  *Id.* (citation omitted). "Accordingly, for contract terms outside the four corners of a contract to be incorporated by reference into the contract, the terms to be incorporated generally must be clearly and expressly identified."  *Id.*  "General or oblique references to a document to be incorporated, in contrast, are usually insufficient to support a finding that the document was incorporated by reference."  *Id.* at 450.

In *French v. Centura Health Corp.*, 509 P.3d 443 (Colo. 2022), the Supreme Court of Colorado collected a number of cases from other jurisdictions it found persuasive.  *See id.* at 449–50.  Among the fact patterns the *French* court listed as acceptable examples of incorporation by reference were a case where "express references in an employment contract to a university's governance document were sufficient to incorporate the governance document by reference," *id.* at 449–50 (citing *Britt v. Univ. of Louisville*, 628 S.W.3d 1, 7–8 (Ky. 2021)), and a case where "'Standard Terms and Conditions' were incorporated by reference" because they "were referenced expressly, by name and in boldface type," *id.* at 450 (citing

*RTS Shearing, LLC v. BNI Coal, Ltd.*, 965 N.W.2d 40, 46 (N.D. 2021)).
By contrast, cases cited by the *French* court where the documents
were not incorporated included those where "a mere reference to
[an] amendment, without more, was insufficient to incorporate its
substance," *id.* (citing *Town of Cheswold v. Cent. Del. Bus. Park*, 188
A.3d 810, 818–19 (Del. 2018)), or where "a reference in a contract
to the seller's 'Terms of Sale' was insufficient to incorporate the
terms of sale contained on the seller's website because merely plac-
ing quotation marks around the phrase 'Terms of Sale,' without
more, was insufficient to convey to the buyers that the seller was
referring to anything other than the sales terms expressly enumer-
ated within the four corners of the parties' contract," *id.* (citing
*Walker v. BuildDirect.Com Techs., Inc.*, 349 P.3d 549, 554 (Okla.
2015)).

The case before us is more similar to the former category of
cases than the latter. The Face Page did not just make a "[g]eneral
or oblique reference[] to a document to be incorporated," *id.*, but
expressly named the T&C printed on the Rental Jacket, and re-
quired the signer to assent to their incorporation and acknowledge
that she had been given the opportunity to read them. There was
no ambiguity in the Face Page that the T&C were a separate doc-
ument.

Sixt argues anyway that *French*'s requirement that the parties
"had knowledge of and assented to the incorporated terms" means
that the parties must have actual knowledge or be directly told how
to access the T&C. Sixt says that because Borel did not receive the

Rental Jacket until after she signed the contract, she could not have had knowledge of the terms. But the list of cases provided by *French* explaining the "knowledge of" requirement does not support this conclusion. *See id.* at 449–50 (citing *Britt*, 628 S.W.3d at 7–8 (holding that an employment contract stating that the terms of employment include all rules promulgated in a "governance document known as The *Redbook*" was sufficient to incorporate the governance document by reference)).

Sixt also relies on *French*'s citation to *State ex rel. U-Haul Co. of West Virginia v. Zakaib*, 752 S.E.2d 586 (W. Va. 2013). In *French*, the Supreme Court of Colorado described *Zakaib* as "concluding that a brief mention of an addendum in preprinted and electronic rental contracts was insufficient to incorporate the addendum by reference when renters were not given copies of the addendum prior to signing the rental contracts," and emphasized *Zakaib*'s conclusion that "[a]n oblique reference to a separate, non-contemporaneous document is insufficient to incorporate the document into the parties' final contract." *French*, 509 P.3d at 450 (citing *Zakaib*, 752 S.E.2d at 595, 598).

But *French*'s reliance on *Zakaib* is distinguishable. *French* cited *Zakaib* to illustrate the type of reference that is too "[g]eneral or oblique" to incorporate additional terms, as opposed to references that "clearly and expressly identif[y]" such terms. *See id.* at 449–50. The references in *Zakaib* were too oblique for three reasons. First, the rental addendum in *Zakaib* was referenced only "succinctly" and "with no detail provided to ensure that U-Haul's

customers were aware of the Addendum and its terms." *Zakaib*, 752 S.E.2d at 591, 598. Second, the addendum itself was difficult to identify, because it was "designed to look more like a document folder advertising U-Haul products, services, and drop-off procedures, rather than a legally binding contractual agreement." *Id*. Finally, and "most troubling" to the *Zakaib* court, customers had no way of accessing the addendum prior to signing because it was U-Haul's policy "to provide customers a copy of the Addendum *only after* the Rental Agreement had been executed." *Id*.

By contrast, as we have repeatedly emphasized, the T&C in this case were specifically named, clearly distinguished in the Face Page from the Face Page itself, and the fact that the T&C were found in the Rental Jacket was apparent from both the text of the Face Page and cover of the Rental Jacket itself. The T&C were also available online and Sixt's policy was to have copies available for customer review. And, far from U-Haul's policy of never showing the customer the addendum, Borel was expressly required to acknowledge that she had the opportunity to review the T&C before signing.

Finally, Sixt asserts that Borel could not have assented to *any* incorporation clauses in the Face Page because she did not read the Face Page before signing the electronic pad. Like with Calderon, Sixt failed to raise this argument prior to oral argument and so these "arguments come too late." *Sapuppo*, 739 F.3d at 683. We do not address arguments that have been abandoned. *Id*. at 680.

Moreover, it is not clear from the record that it is necessarily true that Borel did not read the Face Page. In her deposition, Borel only said that she did not *physically touch* the printed Face Page until after she signed, but could not specifically remember one way or another whether she saw the Face Page prior to signing. And, as we have already observed, Sixt's professed standard practice was to present a copy of the Face Page to the customer prior to requesting any signature. Assuming arguendo that Borel did not read the Face Page, however, even if this argument had not been abandoned it would still fare no better under Colorado law than it did under Florida law. Under Colorado law, "in the absence of fraud," a party who signs a contract "is presumed to know its contents" and is bound by all conditions within the contract even if the party did not in fact read the contract. *B & B Livery, Inc. v. Riehl*, 960 P.2d 134, 138 n.5 (Colo. 1998) (citing *Cordillera Corp. v. Heard*, 592 P.2d 12 (Colo. App. 1978), *aff'd*, 612 P.2d 92 (Colo. 1980)). Colorado courts have found this rule even more applicable where -- as here -- the signer testifies that she has signed similar contracts in the past and is familiar with the process. *Id.* Borel testified that she did not remember the specifics of the rental process at issue in this case because she had "rented so often" over so many years.

Moreover, Colorado law is clear that where a signatory to a contract "does not have actual notice of certain contract terms, [she is] nevertheless bound by such terms if [she is] on inquiry notice of them and assent[s] to them through conduct that a reasonable person would understand to constitute assent." *Macasero v. ENT Credit Union*, 533 P.3d 982, 990 (Colo. App. 2023) (quoting *Starke v.*

*SquareTrade, Inc.*, 913 F.3d 279, 289 (2d Cir. 2019)). Borel reserved her rental car ahead of time, prepaid for the reservation, arrived on the designated day to pick up the rental car, and signed the Face Page by using the electronic signature pad. Again, Sixt does not allege that it induced Borel to sign through fraud, and there is no evidence of fraud in this record. Thus, even if Borel did not see the Face Page itself before she signed, under Colorado law she was on "inquiry notice" as to the Face Page's terms, including those incorporating the T&C. *See id.*

The T&C were incorporated into Borel's Rental Agreement. The district court erred in granting summary judgment to Sixt as to Borel's breach of contract claims.

## IV.

Finally, we address the Plaintiffs' statutory claims under FDUTPA. FDUTPA provides that "[i]n any action brought by a person who has suffered a loss as a result of a violation of [the statute], such person may recover actual damages, plus attorney's fees and court costs." Fla. Stat. § 501.211(2). "Thus a consumer claim for damages under FDUTPA has three elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *Rollins, Inc. v. Butland*, 951 So. 2d 860, 869 (Fla. 2d DCA 2006) (collecting cases).

"The standard for determining the actual damages recovered under FDUTPA is well-defined in the case law." *Id.* "[T]he measure of actual damages is the difference in the market value of the product or service in the condition in which it was delivered

and its market value in the condition in which it should have been delivered according to the contract of the parties." *Rollins, Inc. v. Heller*, 454 So. 2d 580, 585 (Fla. 3d DCA 1984) (quoting *Raye v. Fred Oakley Motors, Inc.*, 646 S.W.2d 288, 290 (Tex. App. 1983)). "FDUTPA does not provide for the recovery of nominal damages, speculative losses, or compensation for subjective feelings of disappointment." *Butland*, 951 So. 2d at 873. In other words, a FDUTPA claim necessarily fails unless the plaintiff suffered "out-of-pocket damages." *Himes v. Brown & Co. Secs. Corp.*, 518 So. 2d 937, 938 (Fla. 3d DCA 1987).

The district court held that none of the Plaintiffs can show actual damages because none of them paid Sixt's invoices out of their own pockets: Calderon refused to pay his invoice and the charges were dropped by Sixt; Marin's invoice was split between his insurer and his employer; and Borel's invoice was paid wholly by her employer.[2]

For the reasons described below, even viewing the evidence in the light most favorable to the Plaintiffs, none of the Plaintiffs

---

[2] As a preliminary matter, Sixt argues that "[b]ecause Plaintiffs did not argue to the district court that they could prove actual damages," but only that they had standing, "their attempts to do so on appeal should be waived." But the district court's order granting summary judgment clearly addresses the issue of whether the Plaintiffs could prove actual damages on the merits. "There can be no forfeiture where the district court nevertheless addressed the merits of the issue." *Hi-Tech Pharms., Inc. v. HBS Int'l Corp.*, 910 F.3d 1186, 1194 (11th Cir. 2018) (alteration adopted) (quotation marks omitted) (quoting *United States v. Clariot*, 655 F.3d 550, 556 (6th Cir. 2011)).

suffered any actual out-of-pocket damages. We affirm the district court's grant of summary judgment for Sixt as to each of the FDUTPA claims.

## A.

In the first place, Calderon did not suffer any out-of-pocket damages as required to sustain a FDUTPA claim. Calderon never paid any of the charges invoiced by Sixt and, on January 25, 2018, Sixt canceled its claim against Calderon and deleted all charges from his account. Therefore, he has not suffered actual damages and his FDUTPA claim necessarily fails. *See Butland*, 951 So. 2d at 873.

Calderon's sole argument on appeal is that, if the T&C were not incorporated by reference into the Face Page, then he suffered actual damages as a result of his $27 payment to Sixt for the "Partial Damage Waiver," a product that only has a use if he is liable for damages to the car under the T&C. However, as we have already explained, the T&C *were* incorporated by reference into the Face Page agreement. Calderon concedes that if we reverse the district court's order on the breach of contract claims and hold that the T&C were incorporated -- as we have -- his damage theory does not apply.

Therefore, as he acknowledges, no reasonable jury could find that Calderon suffered any actual damages for the purposes of a FDUTPA claim. The district court did not err in granting summary judgment on Calderon's FDUTPA claims.

**B.**

Marin and Borel similarly cannot show that they have suffered any actual damages because neither of them paid the invoice sent to them by Sixt out of their own pocket. Marin's insurer, Allstate, paid the amounts associated with his repair costs, and Marin expensed the remaining balance to his business, which is a separate legal entity. Borel's entire balance was paid by her employer.

Marin and Borel argue that they are nevertheless entitled to recover damages for which they were personally liable but which were ultimately paid for by a third party under the "collateral source rule."[3] This argument is a novel one that has never been addressed by a Florida court. However, we can say with confidence that the argument is not persuasive because the Plaintiffs misunderstand the collateral source rule.

The purpose of the collateral source rule is to preserve a plaintiff's right to recover the value of damages from a tortfeasor without offset for any amounts received in compensation for the injury from a third party. *Higgs v. Costa Crociere S.P.A. Co.*, 969 F.3d

---

[3] Sixt urges that Marin and Borel have waived their collateral source argument by not raising it during summary judgment briefing. However, it appears that they did raise the issue in the context of standing -- and the district court acknowledged it -- they simply did not make the argument with the same level of depth during summary judgment as they do now, nor did they use the phrase "collateral source" rule. To the extent that Marin and Borel failed to address actual damages as opposed to standing, that issue was not waived because it was addressed on the merits by the district court. *See supra* note 2.

1295, 1310 (11th Cir. 2020); *see also Janes v. Baptist Hosp. of Miami, Inc.*, 349 So. 2d 672, 673 (Fla. 3d DCA 1977) (per curiam). In other words, the collateral source rule concerns not the elements of liability, but the determination of damages owed. *See Janes*, 349 So. 2d at 673. The rule prevents a wrongdoer from benefiting from the injured party's insurance policy by using insurance monies to offset the damage he owes. *Id.* The cases cited by Marin and Borel are consistent with this. What the collateral source rule does *not* do is allow a third-party payment to satisfy the statutory element of actual damages. This is because in a situation where the plaintiff was not reimbursed, but in fact never paid any money out-of-pocket at all, the plaintiff never suffered any actual damages.

Although the collateral source rule has never been discussed in the context of FDUTPA specifically, it has been rejected as a theory of satisfying the actual damages element in California's similar statute, the Unfair Competition Law (the "UCL"). Like FDUTPA, the UCL provides a cause of action for a private plaintiff "who has suffered injury in fact and has lost money or property as a result of [] unfair competition." Cal. Bus. & Prof. Code § 17204. Thus, a private plaintiff making a claim under the UCL "must make a two-fold showing: he or she must demonstrate injury in fact *and* a loss of money or property caused by unfair competition." *Peterson v. Cellco P'ship*, 80 Cal. Rptr. 3d 316, 321 (Cal. Ct. App. 2008). *Compare id., with Butland*, 951 So. 2d at 869 ("[A] consumer claim for damages under FDUTPA has three elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages."). Federal district courts have repeatedly rejected the application of the collateral

source rule as a method of fulfilling the UCL's "injury in fact" requirement. *See, e.g.*, *Lucas v. Breg, Inc.*, 212 F. Supp. 3d 950, 965 n.9 (S.D. Cal. 2016) (denying restitution under the UCL because insurance monies used to purchase a product on plaintiffs' behalf cannot be "a standalone source of economic loss -- i.e., injury"); *In re Trasylol Prods. Liab. Litig.*, No. 08-MD-01928, 2010 WL 6098571, at *14–15 (S.D. Fla. Mar. 16, 2010) (applying California law and finding that plaintiffs "fail[ed] to come forward with evidence of financial loss, an essential element for standing under the UCL," because the product was paid for by the insurance company and the collateral source rule was inapplicable).

More generally, courts have found that the collateral source doctrine cannot be used to satisfy a requirement of showing injury-in-fact for standing purposes. *See, e.g.*, *QST Env't, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, No. CIV.98-572-M, 2002 WL 1072310, at *2 n.2 (D.N.H. May 28, 2002) ("The collateral source rule . . . applies only to preserve an award of damages and does not affect a party's standing to litigate a claim."); *Williamson v. Genentech, Inc.*, No. 19-cv-01840-JSC, 2020 WL 1281532, at *6 (N.D. Cal. Mar. 18, 2020) ("It is thus unsurprising that no court has used the collateral source rule to find Article III standing. This Court is not persuaded that it should be the first."). Again, this is because the collateral source rule only applies at the calculation of damages stage -- not the pleading of an injury-in-fact.

Moreover, our conclusion that Marin and Borel have not suffered any actual damages is consistent with at least three Florida

District Courts of Appeal that have categorically held that a plaintiff need not be a consumer in order to bring a FDUTPA claim -- showing that what matters for a FDUPA claim is who made the payment. *Allstate Ins. Co. v. Auto Glass Am., LLC*, 418 F. Supp. 3d 1009, 1018 (M.D. Fla. 2019); *see Bailey v. St. Louis*, 196 So. 3d 375, 382 (Fla. 2d DCA 2016); *Off Lease Only, Inc. v. LeJeune Auto Wholesale, Inc.*, 187 So. 3d 868, 869 n.2 (Fla. 3d DCA 2016); *Caribbean Cruise Line, Inc. v. Better Bus. Bureau of Palm Beach Cnty., Inc.*, 169 So. 3d 164, 169 (Fla. 4th DCA 2015). This makes sense: when third parties -- such as insurers or employers -- make the payment for a consumer, it is only the third party that has suffered the damages. For example, somewhat analogous to this action, in a case where a business fraudulently replaced damaged windshields and then charged the consumers' insurance companies, it was the insurers, not the consumers themselves, who suffered the injury-in-fact and had standing to bring FDUTPA claims against the business. *Allstate Ins. Co.*, 418 F. Supp. 3d at 1018–19. After all, the "general rule in federal court is that if an insurer has paid the entire claim of its insured, the insurer is the real party in interest . . . and must sue in its own name." *Krueger v. Cartwright*, 996 F.2d 928, 931 (7th Cir. 1993) (citing *United States v. Aetna Cas. & Surety Co.*, 338 U.S. 366, 380–81 (1949)).

In short, Marin and Borel cannot show actual out-of-pocket damages as required by FDUTPA because they never paid anything to Sixt. And the district court did not err in holding that, even viewing the record in the light most favorable to their claims, a reasonable jury could not find that Marin or Borel suffered actual

damages as required by FDUTPA. Summary judgment on these claims was appropriate.

## V.

For the foregoing reasons, the judgment of the district court is affirmed in part as to the FDUTPA claims and reversed in part as to the breach of contract claims. We remand for further proceedings consistent with this opinion.

**AFFIRMED IN PART, REVERSED IN PART, and REMANDED.**